STATE OF NEBRASKA, APPELLEE, V.
DEAN R. MINER, APPELLANT.
659 N.W.2d 331

Filed April 18, 2003. No. S-02-667.

Charles R. Maser, of Truell, Murray & Maser, P.C., for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

After a jury trial, Dean R. Miner was convicted of one count of branding another's livestock in violation of Neb. Rev. Stat. § 54-1,124 (Cum. Supp. 2002) and sentenced to a term of imprisonment of 3 to 6 years. He perfected this direct appeal.

## BACKGROUND

An information filed on June 19, 2001, charged Miner with willfully and knowingly branding or causing to be branded livestock owned by Gary Langenheder, or willfully and knowingly effacing, defacing, or obliterating Langenheder's brand, in Merrick County, Nebraska, "on or about March 22-March 26, 2001." See § 54-1,124. A jury trial was held on April 16 and 17, 2002.

At trial, Langenheder testified that he farms and also raises cattle near St. Libory, Nebraska. In March 2001, Langenheder was feeding 71 yearling heifers in a pen located approximately 1 mile from his home in Howard County. The cattle were branded with Langenheder's registered brand, consisting of a letter "U" over an arrow placed on the right hip of each heifer. At approximately 3:30 p.m. on March 22, Langenheder observed that all the cattle were in the pen.

When Langenheder went to the pen on the following morning, March 23, 2001, he observed that some of the gates had been opened and that some corral panels had been moved. He also noticed vehicle tracks leading to a cattle load-out facility. After

counting only 49 head of cattle, Langenheder concluded that someone had hauled away the other 22 heifers, and he notified law enforcement officials.

Approximately 5 days later, 10 of the missing heifers were located at a sale barn in Beatrice, Nebraska, and another 10 were located at a feedlot in Octavia, Nebraska. Langenheder and Rick Bickford, a criminal investigator and supervisor for the Nebraska Brand Committee, traveled to these locations and identified the heifers. Each of the 20 heifers had new purple ear tags with the name "D.R. Miner" and a number written on the tag.

Langenheder testified that he had branded his cattle approximately 30 days earlier. The cattle located in Beatrice and Octavia had new brands placed over Langenheder's brand on the right hip of each heifer. Each new brand consisted of an "M open 6" pattern and had fresh burn marks. The "M open 6" brand was issued to Miner in October 2000 and expired September 30, 2001. Photographs taken by Bickford depicting the new ear tags and the new brands on the cattle were offered and admitted at trial. Bickford testified that the placement and orientation of the brand on an animal are part of the brand. Miner's "M open 6" brand was to be placed on the left side of the animal. Bickford testified that some of the cattle appeared to have been rebranded more than once in different directions. Upon making inquiry, Bickford learned that the sale barn in Beatrice had issued payment for the cattle to an individual named "Lee Rankin," but that Miner was identified as the owner and seller of the cattle on sale documents dated March 26, 2001.

On March 29, 2001, Bickford and the sheriff of Howard County traveled to Miner's residence near Silver Creek, in Merrick County, Nebraska. When they initially asked Miner about the brands on the cattle, he blamed it on "the damn kids," but did not elaborate. Miner told Bickford that he bought the heifers from an individual in Grand Island, but could not locate the sale documents in his home. He then called the person he had identified as the seller and obtained by fax what Bickford referred to as a "makeshift bill of sale," reflecting a purchase of cows and bulls on November 20, 2000. Bickford doubted these were the cattle in question because the documents made no reference to calves which could have grown to the size of the heifers

located in Beatrice. Upon further questioning, Miner told Bickford that the "M open 6" brand had been placed on the heifers sideways because he had carpal tunnel syndrome. He also stated that the weather had been very cold when he branded the cattle 2 weeks earlier and that the cattle had been jumping around in the chute. Bickford testified that the brands did not appear to be 2 weeks old.

Miner then accompanied Bickford and the sheriff to an out-building on Miner's property and showed Bickford his "M open 6" electric branding iron. While on Miner's property, Bickford observed feedlot pens, a cattle working chute, corrals, and a cattle load-out chute. When Bickford suggested DNA testing of the heifers in order to prove that they came from the cows and bulls Miner had purchased, Miner stated he did not know which cows the heifers came from and that he no longer had the herd sires.

On the following morning, Miner met with Bickford and the sheriff at the Howard County courthouse in St. Paul, Nebraska. At that meeting, Miner produced a written statement which differed significantly from the account he had given Bickford and the sheriff on the previous day. The statement provided:

March 30, 2001

Over a year ago, a good friend, which we will call "Bob" owed me approximately $25,000 for trucking.

After several attempts at trying to collect this money from him and not being able to, around the first of this year I really started pressuring him.

I knew "Bob" was in trouble because he had lost several of his trucks, and he had a family member dying of cancer. I figured "Bob" had to have some pretty high medical bills.

"Bob" finally contacted me on Wednesday March 21 saying that he still had some cattle and a trailer and that if I would settle for this, then he would turn them over to me and that was the best he could do.

I knew that "Bob" had cattle and a gooseneck trailer in the past and I figured this was the only way I would be able to get at least part of my money. I agreed to settle.

He ask [sic] me if I had a pick up that could pull a gooseneck, because he no longer had his pick up. I told "Bob" he could use it, the keys were in it.

He picked up the truck early Thursday night, March 22, and brought everything back sometime Saturday afternoon. I don't know exactly what time he came back as I was at a basketball tournament with my daughter all day Saturday in St. Paul. We didn't get home till after 9:00 pm and everything was here when we got home. There was a note in my pick up thanking me for letting him use it. When I went out Sunday morning to check the cows, "Bob" had put my brand and ear tags on them. "Bob" had mentioned there was a sale in Beatrice on Monday.

Had I known that the cattle were stolen, I sure wouldn't have accepted them.

Dean Miner

On March 31, 2001, the next afternoon, Bickford and the sheriff executed a search warrant at Miner's residence. One item seized during the search was a document stored on the hard drive of a computer in the home, from which it was printed. This document, identified as exhibit 63, was offered by the State at trial and received over the objection of Miner's counsel.

During his cross-examination, Bickford conceded that Miner never directly said he worked or branded the cattle at his residence. He admitted that his investigation produced no witnesses who had observed the cattle in question on Miner's property. Bickford further admitted that the branding iron was portable and that there was no physical evidence that the cattle had been at the Miner residence.

Testifying in his own defense, Miner stated that while living near Silver Creek, he bred cows and then raised and sold the calves. He testified that he bought 84 cows with calves and 3 bulls from an individual in Grand Island in November 1999. From that transaction, he produced two undated bills of sale, which differed from the bill of sale he originally furnished to Bickford.

Miner further testified that he had a trucking agreement with Gail Hammitt whereby Miner furnished a truck used by Hammitt's driver to pull Hammitt's trailers, for which Miner was to receive 26 cents for each mile driven. According to Miner, Hammitt failed to pay him under this agreement, and in October 2000, Miner agreed to take cattle from Hammitt in

partial payment of the debt. Miner produced a bill of sale for the transaction dated October 15, 2000, which states that Miner was to take possession of 126 pairs of "running aged" cows and 5 bulls after January 1, 2001.

On direct examination, Miner testified that cattle, including those which he subsequently sold in Beatrice, were delivered to his residence on March 23, 2001, while Miner was attending a basketball tournament. Miner claimed that when he returned home, he discovered that the cattle had been branded with his brand and that new ear tags had been affixed. He denied branding the cattle himself. He stated that he did not realize that the cattle may have been stolen until Bickford and the sheriff came to his home. At that time, Miner stated that he gave Bickford a different account of the delivery of the cattle because he wanted an opportunity to talk to Hammitt before accusing Hammitt. Miner subsequently admitted that the person referred to as "Bob" in his written statement dated March 30, 2001, is Hammitt.

On cross-examination, Miner explained that the 700-pound heifers delivered to him in March 2001 resembled the calves he had seen in Hammitt's pasture the previous October 2000. Miner stated that he paid $418 for each cow-calf pair in October, and by March 2001, he had sold the heifers alone for $500 each. Miner attributed this profit to favorable market conditions. Miner explained that Hammitt had started delivering cattle pursuant to the bill of sale on March 12, and delivered 100 head between then and March 23. Miner testified that he sold the cattle immediately because he had injured his back in an automobile accident. Miner claimed that he eventually discovered that all of the cattle he had sold were stolen. He explained that his trial testimony differed from his written statement because his previous attorney had advised him not to discuss his agreement to accept cattle from Hammitt. He denied any knowledge of Hammitt's present whereabouts, stating that he had heard that Hammitt had "left the country."

The case was submitted to the jury, and a verdict of guilty was returned on April 17, 2002. Miner was subsequently sentenced to a term of imprisonment of 3 to 6 years.

## ASSIGNMENTS OF ERROR

Miner assigns that (1) there was insufficient evidence to convict him of the crime charged and (2) the district court erred in admitting exhibit 63.

## STANDARD OF REVIEW

■ When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Canaday*, 263 Neb. 566, 641 N.W.2d 13 (2002).

■ In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631 (2002); *State v. Pruett*, 263 Neb. 99, 638 N.W.2d 809 (2002).

## ANALYSIS

### SUFFICIENCY OF EVIDENCE

■ Miner argues that there is insufficient evidence to support his conviction because "there simply was no evidence that the cattle in question were ever branded in Merrick County, Nebraska." Brief for appellant at 8-9. While it is true that there is no *direct* evidence of this fact, it is supported by a considerable amount of circumstantial evidence. Circumstantial evidence is not inherently less probative than direct evidence. *State v. Nelson*, 262 Neb. 896, 636 N.W.2d 620 (2001); *State v. Castor*, 262 Neb. 423, 632 N.W.2d 298 (2001). In finding a defendant guilty beyond a reasonable doubt, a jury may rely upon circumstantial evidence and the inferences that may be drawn therefrom. *State v. Thompson*, 244 Neb. 375, 507 N.W.2d 253 (1993).

Viewed in a light most favorable to the State, we determine there is circumstantial evidence in the record from which a jury could reasonably conclude that Miner's brand was placed over Langenheder's brand while the cattle were on Miner's property in Merrick County. The electric branding iron with which the cattle were branded was found at that property. Evidence in the

record indicates that the brand was registered to Miner and that the cattle all had his brand and ear tags when they arrived at the sale locations approximately 4 days after they were reported missing by Langenheder. In the various accounts Miner gave to investigators prior to trial, he did not specifically deny branding the cattle or being involved in the branding. He initially blamed the poor branding on "the damn kids," but subsequently tried to explain the poor branding by stating that he had carpal tunnel syndrome, that the weather was very bad on the day the branding was done, and that the cattle were jumping around. A reasonable inference could be drawn from this evidence that the branding occurred on Miner's property, and there is no dispute that the property was located in Merrick County. This assignment of error is without merit.

## Exhibit 63

Exhibit 63, the document printed from the hard drive of a computer found at Miner's residence, states:

Every year hundreds of farmers have suffered the loss from cattle rustlers. It seems that the cattle are put out to pastures that have access roads that are easily reached and if the farmer has a large quantity of cattle, before he realizes they are gone, its [sic] too late to do anything about it.

We have just borrowed your cattle without your knowledge to prove a point. We know this is possible because it happened to us.

What we are suggesting is to let us bring back your cattle, and work with you to have a micro chip built that has a tracking device that can be inserted into the ear tag or directly under the skin of each head of cattle.

If you choose not to work with the tracking device we have started a calving facility that allows you to place your cows in as [sic] highly secured area that has a 24-hour monitoring system.

Call us today . . . . Let us set [sic] down and work out a plan that's best for you.

Dean Miner or Lee Rankin

At the time this exhibit was offered by the State, Miner's counsel interposed the following objection:

> Your Honor, I'm going to object to Exhibit 63 first of all because it was a result of the search which was subject of the Motion to Suppress. Secondly, there's no evidence that this ever was out in the public domain, ever was anywhere other than on the computer. The probative value of that is far outweighed by the prejudicial effect that might have on my client. Absolutely no evidence that this thing was ever published anywhere.

The objection was overruled, and Bickford was allowed to read the contents of the exhibit to the jury. Miner subsequently testified that he had no knowledge of the document until several months into the investigation.

Miner argues on appeal that exhibit 63 was irrelevant and therefore inadmissible under Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 1995), or, alternatively, that any probative value of the exhibit was outweighed by its prejudicial effect, thus making the exhibit inadmissible under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995). Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *State v. McLemore*, 261 Neb. 452, 623 N.W.2d 315 (2001); *State v. Canbaz*, 259 Neb. 583, 611 N.W.2d 395 (2000); Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995). The exercise of judicial discretion is implicit in determinations of relevancy, and a trial court's decision regarding it will not be reversed absent an abuse of discretion. *State v. Brouillette, ante* p. 214, 655 N.W.2d 876 (2003); *State v. Haltom*, 264 Neb. 976, 653 N.W.2d 232 (2002).

The manner in which Langenheder's cattle came into Miner's possession was a fact of consequence to the determination of the action in that the State was required to prove that Miner "willfully and knowingly" either branded livestock owned by another or defaced the owner's brand. § 54-1,124. From exhibit 63, it could reasonably be inferred that Miner and Rankin, whose names both appear on the Beatrice sale documents, were involved in the planning or execution of a scheme whereby cattle were removed from the owner's premises without the owner's knowledge. Thus, assuming without deciding that Miner's trial

objection was sufficiently specific to raise an issue of relevance, the district court did not abuse its discretion in overruling it on that ground.

The objection clearly did raise the issue of whether exhibit 63 should have been excluded under § 27-403, which requires exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." The fact that evidence is prejudicial is not enough to require exclusion under this rule, because most, if not all, of the evidence a party offers is calculated to be prejudicial to the opposing party; it is only the evidence which has a tendency to suggest a decision on an improper basis that is unfairly prejudicial under § 27-403. *State v. Decker*, 261 Neb. 382, 622 N.W.2d 903 (2001). Although we do not regard exhibit 63 as having a particularly high degree of probative value, neither can we say that its receipt into evidence resulted in unfair prejudice to Miner. While the exhibit supports an inference that Miner was involved in "borrowing" cattle owned by others without their knowledge, it also supports an inference that such actions were not taken with larcenous intent, but, rather, were part of a misguided promotion of bovine security services offered by Miner and Rankin. We therefore cannot say that the district court abused its discretion in not excluding this evidence under § 27-403. Even if we did find error in this regard, we would consider it harmless. Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *State v. Duncan, ante* p. 406, 657 N.W.2d 620 (2003); *State v. Brouillette, supra.* Based upon our review of the entire record, including the undisputed evidence that Miner's brand was placed over that of Langenheder's on each of the stolen heifers and Miner's conflicting accounts of the manner in which the cattle came into his possession, we have no difficulty in concluding that the guilty verdict was surely unattributable to the admission of exhibit 63.

## CONCLUSION

There is sufficient circumstantial evidence in the record to support a finding that the charged offense was committed by Miner

at his residence in Merrick County, and there was no reversible error in receiving exhibit 63 in evidence over Miner's objection. The judgment of the district court is therefore affirmed.

AFFIRMED.