STATE OF NEBRASKA, APPELLEE, V.
JUAN A. GUZMAN-GOMEZ, APPELLANT.
690 N.W.2d 804

Filed January 4, 2005. No. A-04-023.

236

Jerry J. Fogarty, Deputy Hall County Public Defender, for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

SIEVERS, MOORE, and CASSEL, Judges.

CASSEL, Judge.

## I. INTRODUCTION

Juan A. Guzman-Gomez was convicted of operating a motor vehicle while under the influence of alcohol, causing serious bodily injury, and sentenced to 20 to 60 months in prison. He appeals, alleging that the trial court erred in its rulings on his pretrial motions to exclude certain evidence, in allowing opinion evidence as to whether he was intoxicated, and in imposing an excessive sentence. Guzman-Gomez further alleges that the evidence was insufficient to support his conviction. We conclude that Guzman-Gomez' assignments of error lack merit, and we therefore affirm.

## II. BACKGROUND

On April 22, 2003, in the district court for Hall County, Guzman-Gomez was charged by information with operation of a motor vehicle while under the influence of alcohol, causing serious bodily injury, a Class IIIA felony in violation of Neb. Rev. Stat. § 60-6,198 (Reissue 2004). The information alleged that while in operation of a motor vehicle in violation of Neb. Rev. Stat. § 60-6,196 (Cum. Supp. 2002), Guzman-Gomez proximately caused serious bodily injury to another person. Guzman-Gomez was arraigned on the charge and pleaded not guilty.

## 1. Pretrial Motions

On August 28, 2003, Guzman-Gomez filed three motions to suppress. In the first motion, he moved for the trial court to suppress evidence seized as a result of the traffic stop, because the stop "was not made with reasonable and articulable suspicion that the vehicle or an occupant was subject to seizure for violation of the law." In the second motion, Guzman-Gomez requested suppression of the fruits of the arrest, search, and seizure for lack of probable cause. Guzman-Gomez further moved to suppress the results of all chemical tests and seizure of his blood, breath, and urine for chemical testing, because they were obtained in violation of the Fourth Amendment to the U.S. Constitution and "not authorized under Nebraska law." He further alleged that the admission of such test results into evidence was "not authorized under Nebraska law." In the third motion, Guzman-Gomez moved for the suppression of statements he had made to law enforcement officers and their agents, because the statements were not made voluntarily.

Also on August 28, 2003, Guzman-Gomez filed a motion in limine "Re: Chemical Analysis." Therein, he requested that evidence of the results of any preliminary breath test or chemical test be excluded at trial, because the preliminary breath test was relevant only to the issue of probable cause for a chemical test, because samples were "not authorized to be taken under Nebraska law," and because the chemical tests therefrom were "not admissible . . . under Nebraska law."

The court conducted a hearing on Guzman-Gomez' motions. The State stipulated that evidence from any search and seizure had been obtained without a warrant.

Andrew Fairbanks, a Hall County deputy sheriff, testified that he was on duty on February 16, 2003, operating a marked patrol vehicle and wearing a uniform and badge. At approximately 1:30 a.m., he was dispatched to the scene of a motor vehicle accident. At approximately 1:46 a.m., while en route to the scene, Fairbanks saw two men walking "east toward Grand Island on [U.S.] Highway 30," approximately one-half mile from the scene of the accident. Fairbanks stopped, and an ambulance "pulled up with [him]." Fairbanks spoke to the two men and ascertained, despite a "language barrier," that Guzman-Gomez was one of

them. The other man was later identified as Guzman-Gomez' brother. Guzman-Gomez was bleeding from a cut on the left side of his forehead. Jessica Hoback, another deputy with the Hall County Sheriff's Department, radioed Fairbanks from the scene of the accident and reported that an individual had been ejected from the vehicle and was still at the scene. Fairbanks dispatched the ambulance to the accident scene, and Fairbanks then transported Guzman-Gomez and his brother to the accident scene. There, Fairbanks "had the two subjects exit [his] vehicle" to receive treatment by paramedics. Guzman-Gomez and his brother were transported to the hospital via ambulance, and Fairbanks went to the hospital sometime afterward.

Fairbanks noticed "numerous" beer bottles and cans located around the vehicle involved in the accident. Fairbanks did not recall the exact number of beer containers, but testified that he saw more than one. Fairbanks did not testify whether he observed the beer containers when he transported Guzman-Gomez and his brother to the accident scene or when he viewed the scene at a later time. Fairbanks testified that it was later determined that the vehicle at the accident scene was registered to Guzman-Gomez.

Clark Finecy, a deputy sheriff with the Hall County Sheriff's Department and an accident reconstructionist, testified that he was called to the accident scene at approximately 2 a.m. on February 16, 2003. Finecy saw during his investigation of the scene more than one beer bottle inside the vehicle, but he did not recall how many.

Fairbanks testified that at the hospital, Guzman-Gomez and his brother gave accounts of the accident through an interpreter. During the interview, Guzman-Gomez was lying on a bed in the emergency room and appeared to be uncomfortable but not suffering unbearable pain. Fairbanks denied making any promises or threats to Guzman-Gomez through the interpreter. In Fairbanks' opinion, Guzman-Gomez was free to leave at any time. Guzman-Gomez told the interpreter that he was sitting in the back seat of the vehicle on the left side and that he could not remember who had been driving. Then Guzman-Gomez told the interpreter that his brother was sitting in the back seat with him and that the man ejected from the vehicle, later identified as Alfonso Flores-Dominguez, was driving. Guzman-Gomez' brother informed the

interpreter that he was in the back seat with Guzman-Gomez when the vehicle started to flip and he then found himself in the front seat. Guzman-Gomez' brother then stated that he tried to help Guzman-Gomez steer the vehicle.

Thereafter, Fairbanks informed Finecy of the accounts of Guzman-Gomez and his brother. Finecy advised Fairbanks that the accounts of the two men were inconsistent with Finecy's investigation. Quinn Webb, a Spanish-speaking deputy with the Hall County Sheriff's Department, then interviewed Guzman-Gomez. Fairbanks did not testify about the content of Webb's interview.

Webb testified that he was "fairly" familiar with the Spanish language and had received 120 hours of Spanish training through law enforcement. He had used Spanish every day for approximately 2 years in his position as a deputy. On February 16, 2003, he was working a part-time job at a Grand Island hospital when he was called to duty in his capacity as a deputy. Webb was advised to speak to Guzman-Gomez in the emergency room at the hospital. Finecy informed Webb that because of the injuries Guzman-Gomez exhibited, Finecy believed that Guzman-Gomez had been the driver of a vehicle that had been involved in an accident. Webb questioned Guzman-Gomez in Spanish. Webb asked whether Guzman-Gomez was the driver of the vehicle. Guzman-Gomez several times denied being the driver. Each time, Webb asked in Spanish, " '[I]s that the truth or that's not the truth?' " Webb testified that eventually, Guzman-Gomez said, " 'Yes, I was driving.' "

During the conversation, Guzman-Gomez was in a bed in the trauma room of the emergency room and was being treated by a physician for visible injuries consisting of minor cuts. Webb stated that it appeared to him that Guzman-Gomez was free to leave at any time and was not being restrained or prevented from leaving. Webb denied promising Guzman-Gomez anything in exchange for speaking with him. Webb did not read Guzman-Gomez the *Miranda* warnings before speaking to him.

Guzman-Gomez testified on his own behalf. He admitted being interviewed by a deputy sheriff at the hospital but denied telling the deputy that he had been driving.

Fairbanks testified that after the interview with Webb, Guzman-Gomez was asked to submit to a preliminary breath test,

which Fairbanks administered at 6:05 a.m. and which yielded a "failing result." Guzman-Gomez was then placed under arrest. At no time was Guzman-Gomez given *Miranda* warnings, and Fairbanks denied asking Guzman-Gomez any questions after his arrest. After Guzman-Gomez was transported to the sheriff's office, Fairbanks read Guzman-Gomez the Spanish language version of the postarrest chemical test advisement form. At 6:34 a.m., Guzman-Gomez submitted to an Intoxilyzer 5000 test that produced a result of .117 grams of alcohol per 210 liters of breath.

The court sustained in part the motion in limine, prohibiting the State from referring to the preliminary breath test at any time during trial and implicitly overruling the remainder of the motion. The court overruled Guzman-Gomez' motions to suppress.

## 2. Jury Trial

On November 3, 2003, a jury trial commenced. Hoback testified that she was dispatched to the scene of the accident at approximately 1:33 a.m. on February 16. Hoback discovered a man, later identified as Flores-Dominguez, lying face down on the south side of the vehicle. There was a large amount of blood around his head, and Hoback was not able to locate a pulse in his wrist. The man was transported to a hospital in Grand Island and later, via helicopter, to a Lincoln hospital. Hoback also observed a beer can located near the rear of the vehicle and several beer bottles inside the vehicle.

Hoback described the site of the accident as an east-west road that curves sharply to the south at approximately a 90-degree angle. There are signs warning of the upcoming curve, and the speed limit for eastbound traffic drops from 55 miles per hour to 35 miles per hour at the onset of the curve. The accident in this case took place at 1:30 a.m., and there was no street lighting where it occurred.

Webb again testified that on the night of the accident, he conversed in Spanish with Guzman-Gomez at the hospital in Grand Island. Guzman-Gomez was not under formal arrest at the time of the interview, and other people were present. Guzman-Gomez told Webb that he had been driving the vehicle that was involved in the accident that night. Counsel for Guzman-Gomez objected to Webb's testimony about Guzman-Gomez' statements, referring

to the previous motion to suppress. The trial court overruled the objection.

Finecy testified about his investigation of the accident scene. Most of the left side of the rear end of the vehicle was detached and located several feet away from the vehicle. There were skid marks on the road going toward the ditch and indications that the vehicle had struck a tree. A sign warning drivers of the upcoming curve was on the ground. Finecy observed that the rear seatbelt had not been in use during the accident.

Finecy concluded that the accident occurred because the driver failed to negotiate the curve. As the driver tried to turn right, the vehicle began to slide in a clockwise motion, continuing into the ditch and striking a tree with the vehicle's left side. The vehicle then rotated counterclockwise and came to a rest facing west. Finecy stated that through his training, education, and experience, he learned that failing to negotiate a curve could be an indication that someone is impaired by alcohol but that it could also indicate other factors such as poor driving skills or an equipment failure.

Finecy opined that based on the points of impact, the driver would have incurred some injuries to his left side, but the rear seat passenger would have incurred many more injuries. At the hospital, Finecy observed the occupants' injuries. Guzman-Gomez had a cut on the left side of his head and a rashlike injury to his chest, beginning at his left shoulder and angling downward across his chest. Finecy testified that these markings were consistent with Guzman-Gomez' having worn a seatbelt during the accident and that the driver's seatbelt was the only seatbelt in the vehicle that could have caused these markings. Finecy observed that the majority of Flores-Dominguez' injuries were to his left side, which indicated to Finecy that Flores-Dominguez had been sitting on the left side of the back seat of the vehicle.

Flores-Dominguez testified that on the evening of February 16, 2003, he was the back seat passenger in a vehicle driven by Guzman-Gomez. Flores-Dominguez consumed three, four, or five beers while in the vehicle. The parties stipulated that Flores-Dominguez had been involved in the motor vehicle accident in this case and had suffered serious bodily injury which "involved a substantial risk of death, a substantial risk of serious permanent

disfigurement, or a temporary or protracted loss or impairment of the function of any part or organ of his body."

Fairbanks testified that he had investigated 90 to 100 cases involving driving under the influence. Fairbanks had been educated on the effects of alcohol on one's ability to drive, had observed individuals under the influence of alcohol, and had consumed alcohol himself.

During the early morning hours of February 16, 2003, while en route to the scene of the accident, Fairbanks encountered two men walking approximately one-half mile from the accident scene. He identified one of the men as Guzman-Gomez. Guzman-Gomez had a cut on the left side of his forehead. Fairbanks drove Guzman-Gomez and the other man to the accident scene. At the scene, Fairbanks observed more than one beer container. Fairbanks testified, "Once the subjects began to be transported to the hospital, I proceeded to the hospital." Fairbanks testified that he spoke to Guzman-Gomez at the hospital and that Guzman-Gomez told Fairbanks who had been driving the vehicle at the time of the accident. Counsel for Guzman-Gomez objected, referring to the motion to suppress. The trial court overruled the objection and allowed a continuing objection to the testimony regarding the conversation between Fairbanks and Guzman-Gomez. Fairbanks testified that Guzman-Gomez stated that the man who had been ejected from the vehicle, later identified as Flores-Dominguez, was driving.

Fairbanks arrested Guzman-Gomez at the hospital. Fairbanks testified that he transported Guzman-Gomez to the Hall County sheriff's office, and counsel for Guzman-Gomez objected "based on motion to suppress." The trial court overruled the objection but allowed a continuing objection as to testimony regarding any events that occurred after the arrest.

Fairbanks did not administer a field sobriety test, but he did administer a breath test at the sheriff's office at 6:34 a.m. using the Intoxilyzer 5000. The parties stipulated that the Intoxilyzer 5000 was maintained properly and functioning properly on the date of Guzman-Gomez' test. Before administering the test, Fairbanks read the postarrest chemical test advisement form to Guzman-Gomez in Spanish. The form, which was received into

evidence, advised Guzman-Gomez, inter alia, that he had been arrested for operating a motor vehicle while under the influence of alcohol or drugs.

The State offered into evidence the Intoxilyzer 5000 checklist and Guzman-Gomez' test card, both of which included his test results. Counsel for Guzman-Gomez objected, stating, "Motion to suppress, motion in limine, lack of proper and sufficient foundation, relevance and State versus Brouillette." The trial court overruled the objections and received the exhibits into evidence but allowed a continuing objection. Referring to the exhibits, Fairbanks testified that Guzman-Gomez' breath test result was .117 grams of alcohol per 210 liters of breath, a result in excess of the legal limit. The State requested leave to publish those two exhibits to the jury. Counsel for Guzman-Gomez restated the continuing objection, which he specified was not based on the fact that one of the exhibits was a photocopy, and the trial court overruled the continuing objection. Counsel for Guzman-Gomez did not object to the publication of the exhibits to the jury.

The State asked Fairbanks for his opinion, based on his training, experience, education, and observations, as to whether Guzman-Gomez was under the influence of alcohol at the time of the accident. Counsel for Guzman-Gomez objected based on "[l]ack of proper sufficient foundation, competence and foundation." The trial court overruled the objection. Fairbanks then testified that he believed Guzman-Gomez was under the influence of alcohol at the time of the accident. Upon questioning by counsel for Guzman-Gomez, Fairbanks stated that he based this opinion on the breath test results and the beer containers he observed at the accident scene, not on any behavior on the part of Guzman-Gomez. Counsel for Guzman-Gomez renewed the objection based on lack of foundation, and the trial court overruled the objection.

Fairbanks observed Guzman-Gomez for approximately 15 minutes prior to the test to ensure that Guzman-Gomez did not throw up, belch, or regurgitate any alcohol, which actions would have threatened the accuracy of the test. Fairbanks testified that he was within 2 feet of Guzman-Gomez during that 15-minute period and that he did not observe Guzman-Gomez burping or belching or doing anything improper under the rules. Fairbanks admitted that

although he did not see, hear, or smell Guzman-Gomez belch, it is probably possible to belch without making a noise.

After the above testimony, the State rested. Counsel for Guzman-Gomez called two witnesses to testify regarding the mechanical condition of the vehicle and then rested.

### 3. VERDICT AND SENTENCING

On November 3, 2003, the jury returned a verdict of guilty of operation of a motor vehicle while under the influence of alcohol, causing serious bodily injury. The trial court accepted the verdict.

A presentence investigation was prepared, and the trial court reviewed it prior to sentencing. The presentence investigation reflected that Guzman-Gomez was 33 years old at the time of the offense and that except for the present offense, his record included one entry for "No Drivers [sic] License." Guzman-Gomez was born and reared in El Salvador, where he received only a few months of schooling. At the time of trial, Guzman-Gomez had lived in the United States for approximately 4 years. He had five children ranging in age from 5 to 12 and living in El Salvador with their mother, to whom Guzman-Gomez was not married, and Guzman-Gomez sent them financial support when he was able. Guzman-Gomez had been employed in the production department at Swift and Company in Grand Island for approximately 3 years, earning $11.80 per hour. Guzman-Gomez described himself as an occasional user of alcohol. He reported that he may consume as many as 5 or 6 beers per occasion and that he would have to drink 9 or 10 beers to become intoxicated.

The presentence investigator interviewed Flores-Dominguez. After the accident, Flores-Dominguez spent approximately 1½ months in the hospital in Lincoln. He sustained permanent disabilities as a result of the accident; his speech, thought processes, and physical abilities were affected. Flores-Dominguez said that he would most likely never be able to work again. He had no health insurance and did not know how he would pay his medical bills, which totaled more than $150,000. Guzman-Gomez was asked what he thought he should do to "make up for" the injuries suffered by Flores-Dominguez, and Guzman-Gomez responded, "Insurance will take care of the medical bills."

In sentencing Guzman-Gomez, the trial court stated that it had considered the presentence investigation; statements of counsel; Guzman-Gomez' age, mentality, education, experiences, social and cultural background, and criminal history; the motivation for the offense; and the nature of the offense. The trial court sentenced Guzman-Gomez to 20 to 60 months in prison. The trial court also revoked Guzman-Gomez' motor vehicle operator's license for a period of 15 years, commencing after his release from prison.

## III. ASSIGNMENTS OF ERROR

Guzman-Gomez alleges the trial court erred in (1) overruling his motions to suppress evidence and statements and receiving such evidence and statements at trial, (2) overruling his motion in limine regarding the chemical test, (3) allowing evidence of the chemical test over his objections, (4) allowing opinion evidence regarding whether he had been intoxicated, and (5) imposing an excessive sentence. Additionally, Guzman-Gomez alleges that the evidence was insufficient to convict him of the crime charged.

## IV. STANDARD OF REVIEW

A trial court's ruling on a motion to suppress evidence, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, is to be upheld on appeal unless its findings of fact are clearly erroneous. *State v. Manning*, 263 Neb. 61, 638 N.W.2d 231 (2002).

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the rules when judicial discretion is a factor involved in determining admissibility. Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, the admissibility of evidence is reviewed for an abuse of discretion. *State v. Roeder*, 262 Neb. 951, 636 N.W.2d 870 (2001).

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Miner*, 265 Neb. 778, 659 N.W.2d 331 (2003).

██ Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Losinger*, 268 Neb. 660, 686 N.W.2d 582 (2004). An abuse of discretion occurs when a sentencing court's reasons or rulings are clearly untenable and unfairly deprive the litigant of a substantial right and a just result. *Id.*

## V. ANALYSIS

### 1. MOTIONS TO SUPPRESS

#### (a) Stop and Statements

Guzman-Gomez contends that the trial court erred in overruling his motions to suppress and in allowing at trial illegally obtained evidence, because he was illegally detained and subjected to custodial interrogation without the benefit of *Miranda* warnings.

#### (i) Illegal Detention

██ Guzman-Gomez argues that because he was illegally detained, all evidence obtained after his detention, including evidence of the chemical test, should have been suppressed. He contends that he was "stopped and detained . . . without any articulable suspicion of criminal activity." Brief for appellant at 19. "If there is no detention or seizure within the meaning of the Fourth Amendment to the U.S. Constitution, then the Fourth Amendment safeguard against an unreasonable seizure is not implicated in an encounter between a private citizen and a police officer." *State v. Anderson*, 258 Neb. 627, 635, 605 N.W.2d 124, 132 (2000). Thus, without a seizure, reasonable suspicion is not required. *Id.* A seizure in this context occurs " ' "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." ' " *State v. Twohig*, 238 Neb. 92, 102, 469 N.W.2d 344, 351 (1991), quoting *Michigan v. Chesternut*, 486 U.S. 567, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988).

A seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area, even if the

officer has no reason to suspect the individual is involved in criminal activity, provided the officer does not indicate that compliance with his or her request is required. . . . Circumstances indicative of a seizure may include " 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' "

(Citations omitted.) *State v. Anderson*, 258 Neb. at 635-36, 605 N.W.2d at 132. Guzman-Gomez urges that a reasonable person in his situation would not have felt free to leave.

While Guzman-Gomez and his brother were walking along a highway, not far from an accident scene, they encountered Fairbanks, who was driving a patrol vehicle and was in uniform. Fairbanks attempted to communicate with them but apparently did not exercise a show of authority or physical force. Guzman-Gomez was visibly injured and bleeding. Guzman-Gomez and his brother accompanied Fairbanks back to the scene of the accident, where Guzman-Gomez and his brother received medical treatment from paramedics and where at least one other law enforcement officer was present. Guzman-Gomez and his brother were transported to the hospital via ambulance, and Fairbanks proceeded to the hospital afterward. Guzman-Gomez received further medical treatment at the hospital and was interviewed about the accident by law enforcement officers for two brief periods over the course of several hours. He was not restrained, and though he appeared uncomfortable, he had been able to walk approximately one-half mile immediately after the accident. Guzman-Gomez did not receive any promises or threats from law enforcement. In Fairbanks' and Webb's opinions, Guzman-Gomez was free to leave at any time. After Guzman-Gomez admitted that he was the driver, he was asked to submit to a preliminary breath test. Due to the "failing result," Guzman-Gomez was placed under arrest. Based on these facts, we conclude that a reasonable person in Guzman-Gomez' circumstance would have felt free to leave. Therefore, because there was no seizure, the safeguards against unreasonable searches and seizures were not implicated in this case, and the trial court was

not clearly erroneous in overruling Guzman-Gomez' motion to suppress on this basis.

### (ii) Miranda *Warnings*

Guzman-Gomez argues that the trial court erred in not suppressing his statements to law enforcement officers and in admitting the statements at trial, because he was subjected to custodial interrogation without the benefit of *Miranda* warnings. The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). *Miranda* warnings are required only where there has been such a restriction on one's freedom as to render one "in custody." *State v. Brouillette*, 265 Neb. 214, 655 N.W.2d 876 (2003). Thus, we must first determine whether Guzman-Gomez was in custody during questioning.

Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his or her freedom of action in any significant way. *State v. Melton*, 239 Neb. 506, 476 N.W.2d 842 (1991). In *State v. Melton*, the Nebraska Supreme Court determined that the defendant was not in custody when he was admitted to the hospital for treatment, was not under formal arrest, and was questioned by officers during the routine course of an accident investigation. Likewise, in the instant case, Guzman-Gomez was not under formal arrest when officers questioned him at the hospital about the accident, in an attempt to ascertain who had been driving at the time of the accident. We conclude that Guzman-Gomez was not in custody during questioning and that *Miranda* warnings were not required prior to such questioning. Therefore, the trial court was not clearly erroneous in overruling Guzman-Gomez' motion to suppress on this basis and in allowing his statements at trial.

### (b) Chemical Test

Guzman-Gomez argues that Fairbanks did not have reasonable grounds to believe Guzman-Gomez was operating a motor vehicle on the night of the accident and that Fairbanks therefore did

not have grounds to require the preliminary breath test which led to the chemical breath test. As such, Guzman-Gomez contends that the trial court should have suppressed evidence regarding both the preliminary breath test and the chemical test. Under Neb. Rev. Stat. § 60-6,197(3) (Cum. Supp. 2002), an officer may require a preliminary breath test when he or she has "reasonable grounds to believe that [a] person . . . has been involved in a traffic accident."

Fairbanks encountered Guzman-Gomez one-half mile from the accident. Later, through an interpreter, Guzman-Gomez told Fairbanks that he could not remember who had been driving and then Guzman-Gomez stated that Flores-Dominguez was the driver. Guzman-Gomez' brother stated that he was in the back seat with Guzman-Gomez, but that after the vehicle flipped, he found himself in the front seat and attempted to help Guzman-Gomez steer the vehicle. Finecy informed Fairbanks that these accounts were not consistent with his investigation of the accident scene. Although Fairbanks did not specify how the accounts of Guzman-Gomez and his brother were inconsistent with Finecy's investigation, we can deduce that Fairbanks knew that Finecy had eliminated Flores-Dominguez as a possible driver and that Guzman-Gomez and his brother, who had implied that Guzman-Gomez had been steering, were the only possible drivers. Thus, when Fairbanks opted to administer the preliminary breath test, he had reasonable grounds to believe that Guzman-Gomez had been involved in a traffic accident, and the trial court did not err in refusing to suppress evidence regarding the preliminary breath test and the chemical test.

## 2. Motion in Limine

Guzman-Gomez assigns that the trial court erred in overruling his motion in limine and allowing evidence of his breath test at trial. He argues that the only evidence that he was under the influence of alcohol was the chemical test result of .117 grams of alcohol per 210 liters of breath and that the result, obtained pursuant to § 60-6,197, is inadmissible in a prosecution for a violation of § 60-6,198.

Guzman-Gomez relies on *State v. Brouillette*, 265 Neb. 214, 655 N.W.2d 876 (2003). In that case, the defendant was convicted

of two counts of manslaughter arising out of a traffic accident. As one of the predicates for the manslaughter charges, the State had alleged that the defendant had driven under the influence of alcohol. On appeal, the defendant argued that the trial court erred in refusing to suppress evidence of the test results to determine blood alcohol content from a sample of the defendant's blood taken for medical purposes. The defendant asserted that Neb. Rev. Stat. § 60-6,210(1) (Reissue 1998) provided that the chemical test results of a blood sample taken for medical purposes were admissible only in a prosecution under § 60-6,196 for driving under the influence. Section 60-6,210(1) states:

> If the driver of a motor vehicle involved in an accident is transported to a hospital within or outside of Nebraska and a sample of the driver's blood is withdrawn by a physician, registered nurse, qualified technician, or hospital for the purpose of medical treatment, the results of a chemical test of the sample shall be admissible in a criminal prosecution under section 60-6,196 to show the alcoholic content of or the presence of drugs or both in the blood at the time of the accident . . . .

Citing the general principal that an expressed object of a statute's operation excludes the statute's operation on all other unmentioned objects, the Nebraska Supreme Court held that the plain language of § 60-6,210(1) limits the use of test results obtained for medical purposes to a prosecution under § 60-6,196. *State v. Brouillette, supra,* citing *Pfizer v. Lancaster Cty. Bd. of Equal.,* 260 Neb. 265, 616 N.W.2d 326 (2000).

Guzman-Gomez argues that in the instant case, as in *State v. Brouillette, supra,* the use of samples obtained pursuant to § 60-6,197 is restricted by statute. Neb. Rev. Stat. § 60-6,201 (Reissue 2004) sets forth some of the requirements for valid chemical testing and subsection (1) provides:

> Any test made under section 60-6,197, if made in conformity with the requirements of this section, shall be competent evidence in *any prosecution under a state statute* or city or village ordinance *involving* operating a motor vehicle while under the influence of alcoholic liquor or drugs or *involving* driving or being in actual physical control of a motor vehicle

when the concentration of alcohol in the blood or breath is in excess of allowable levels.

(Emphasis supplied.) Guzman-Gomez does not dispute that Fairbanks obtained a chemical test of Guzman-Gomez' breath alcohol concentration pursuant to § 60-6,197. However, he asserts that the plain language of § 60-6,201 " 'limits the use of the test results . . . to a prosecution for driving under the influence.' " Brief for appellant at 18, quoting *State v. Brouillette, supra.* We disagree.

Unlike § 60-6,210(1), § 60-6,201(1) does not limit the use of the chemical test results to prosecution under a specific statute. Rather, § 60-6,201(1) authorizes the use of results of the specified chemical test as competent evidence in "any" prosecution "under" a state statute "involving" operation of a motor vehicle while under the influence of alcoholic liquor or "involving" such operation with an excessive level of alcohol. Section 60-6,198, the statute under which Guzman-Gomez was convicted, makes it a felony to proximately cause serious bodily injury to another person while operating a motor vehicle in violation of § 60-6,196. In turn, § 60-6,196 prohibits operating a vehicle while under the influence of alcoholic liquor or with a blood or breath alcohol concentration exceeding the specified limits. The prosecution of Guzman-Gomez occurred under a state statute, § 60-6,198, and "involved" the operation of a vehicle while under the influence of alcohol or with an alcohol concentration of the breath or blood in excess of legal limits. Thus, § 60-6,201(1) authorizes the use of such chemical test results in this instance. We conclude that the trial court did not err in overruling Guzman-Gomez' motion in limine and that his assignment of error on this matter lacks merit.

### 3. OPINION EVIDENCE OF INTOXICATION

Guzman-Gomez assigns that the trial court erred in allowing Fairbanks to give opinion testimony as to whether Guzman-Gomez was under the influence of alcohol at the time of the accident. At trial, counsel for Guzman-Gomez objected to this testimony, based on lack of foundation. On appeal, Guzman-Gomez essentially argues that Fairbanks primarily based his opinion on an illegally obtained chemical test, rendering such opinion inadmissible as the " 'fruit of the poisonous tree.' " Brief for appellant at 23. We have concluded that the chemical test was properly

obtained. Therefore, we will consider the chemical test results in determining whether there was sufficient foundation for Fairbanks' opinion testimony.

After sufficient foundation is laid, a law enforcement officer may give opinion testimony as to whether the defendant was driving while under the influence of alcoholic liquor. See *State v. Dail*, 228 Neb. 653, 424 N.W.2d 99 (1988). In *State v. Dail*, an officer opined that the defendant had been driving while under the influence of alcoholic liquor.

> The officer stated [his] conclusion after testifying that he had observed the defendant's car to be weaving, [that] the defendant's eyes were bloodshot and watery, [that] the defendant's speech was slurred, [that] he smelled an odor of alcohol, and [that] the defendant failed most of the standardized field sobriety tests. Further, it had been shown that the officer had been employed by the Bellevue Police Department for over 6 years, that he had received training on the apprehension and detection of intoxicated drivers, that he had made approximately 100 to 150 [driving under the influence] stops, and that he ha[d] had occasion to observe the effects of alcohol on friends, relatives, and neighbors.

*Id.* at 662, 424 N.W.2d at 105. The Nebraska Supreme Court concluded that there was sufficient foundation for the officer to testify that he believed the appellant to have been intoxicated.

In the instant case, Fairbanks testified that he had investigated 90 to 100 cases involving driving under the influence, had been educated on the effects of alcohol on one's ability to drive, and had observed individuals under the influence of alcohol. He testified that he based his opinion on the chemical test results and on the fact that he saw beer containers at the scene of the accident. There was also evidence, in the form of the postarrest chemical test advisement form, that Fairbanks was aware that Guzman-Gomez had been driving at the time of the accident, and Fairbanks had visited the scene of the accident. Although there was no evidence of outward physical symptoms of intoxication, such as slurred speech or watery eyes, Guzman-Gomez' chemical test results showed his breath alcohol level to be over the legal limit, and there was evidence near his vehicle to suggest he had been drinking prior to the accident. We conclude that based

on the facts in the record, there was sufficient foundation for Fairbanks to testify that in his opinion, Guzman-Gomez had been driving under the influence of alcohol. Guzman-Gomez' assignment of error on this matter lacks merit.

### 4. Receiving Chemical Test Results Over Foundational Objection

Guzman-Gomez argues that the trial court erred in receiving evidence of the chemical test results over his foundational objection, because the chemical test was not taken within a reasonable period of time after Guzman-Gomez was stopped by law enforcement officers. He refers us to his objection to the admission of the chemical test results, wherein his counsel stated, "Motion to suppress, motion in limine, lack of proper and sufficient foundation, relevance and State versus Brouillette."

██ If a general objection on the basis of insufficient foundation is overruled, the objecting party may not complain on appeal unless (1) the ground for exclusion was obvious without stating it or (2) the evidence was not admissible for any purpose. *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631 (2002); *State v. Baker*, 245 Neb. 153, 511 N.W.2d 757 (1994). There is nothing in the record that would indicate the period of time between the stop and the chemical test as the basis for Guzman-Gomez' foundational objection. Guzman-Gomez asserts that he addressed this issue in his motion to suppress and his motion in limine when he alleged that the chemical test was "not authorized under Nebraska law" or "not authorized to be taken under Nebraska law" or "not admissible . . . under Nebraska law." We do not consider these broad assertions sufficient to preserve the issue Guzman-Gomez now argues on appeal. Moreover, as we have discussed, Guzman-Gomez has not successfully alleged any other ground rendering evidence of the chemical test results inadmissible. Therefore, we conclude that Guzman-Gomez waived his opportunity to address this foundational objection on appeal, and we will not consider it further.

### 5. Sufficiency of Evidence

Guzman-Gomez assigns that there was not sufficient evidence to support his conviction. He argues this more than once in his brief, always in the context of other assignments of error alleging

that the chemical test was improperly taken or the results improperly received. We have concluded that the trial court did not err in allowing evidence of the chemical test results, which supported Fairbanks' conclusion that Guzman-Gomez had been driving under the influence of alcohol, a violation under § 60-6,196(1)(a). Beer containers were found at the scene of the accident. There was physical evidence that Guzman-Gomez was driving at the time of the accident, and Guzman-Gomez admitted that he was the driver. Pursuant to § 60-6,198(1), "[a]ny person who, while operating a motor vehicle in violation of section 60-6,196 . . . , proximately causes serious bodily injury to another person shall be guilty of a Class IIIA felony . . . ." The parties stipulated that Flores-Dominguez had suffered serious bodily injury. Based on these facts and viewing the evidence in the light most favorable to the prosecution, we conclude that the evidence was sufficient to convict Guzman-Gomez of the crime charged.

## 6. Sentence

Finally, Guzman-Gomez assigns that the trial court imposed an excessive sentence. Guzman-Gomez was convicted of operating a motor vehicle while under the influence of alcohol, causing serious bodily injury. The offense is a Class IIIA felony, punishable by a maximum of 5 years' imprisonment, a $10,000 fine, or both, and a minimum of no punishment. § 60-6,198; Neb. Rev. Stat. § 28-105 (Supp. 2003). In addition, § 60-6,198 requires that the court shall order the offender's motor vehicle operator's license revoked for a period of at least 60 days and not more than 15 years from the date ordered by the court. The trial court sentenced Guzman-Gomez to 20 to 60 months in prison and revoked his operator's license for 15 years, commencing on his release from prison. Clearly, this sentence was within the statutory limits. Thus, we must determine whether the trial court abused its discretion in considering the relevant factors and legal principles in sentencing Guzman-Gomez. See *State v. Losinger*, 268 Neb. 660, 686 N.W.2d 582 (2004).

Factors a judge should consider in imposing a sentence include the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved

in the commission of the crime. *Id.* The trial judge's statements at the sentencing hearing reflect that he considered these factors. Guzman-Gomez argues that prior to the present offense, he was a law-abiding, steadily employed, hard-working man who supported his children. He characterizes the present offense as an "unintentional act unlikely to occur again." Brief for appellant at 24. However, Flores-Dominguez suffered severe and permanent injuries as a result of Guzman-Gomez' conduct. We conclude that the trial court did not abuse its discretion in sentencing Guzman-Gomez.

## VI. CONCLUSION

For the foregoing reasons, we conclude that Guzman-Gomez' assignments of error lack merit, and we therefore affirm.

AFFIRMED.