720 N.W.2d 372 (2006)
271 Neb. 976
NEBRASKA LEGISLATURE on behalf of the STATE of Nebraska, Plaintiff,
v.
C. David HERGERT, Regent, University of Nebraska, Defendant.
No. S-06-425.
Supreme Court of Nebraska.
July 7, 2006.
*377 David A. Domina and Claudia Stringfield-Johnson, of Domina Law Group, P.C., L.L.O., Omaha, for plaintiff.
Christopher M. Ferdico and Jacob P. Wobig, of Baylor, Evnen, Curtiss, Grimit *378 & Witt, L.L.P., Lincoln, and Sean J. Brennan for defendant.
HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, McCORMACK, MILLER-LERMAN, JJ., and HANNON, Judge, Retired.
PER CURIAM.

I. NATURE OF CASE
C. David Hergert was elected to the Board of Regents of the University of Nebraska from the seventh district on November 2, 2004. Shortly thereafter, several complaints were filed against Hergert with the Nebraska Accountability and Disclosure Commission (NADC), the state agency charged with administering and enforcing Nebraska's campaign finance laws. The campaign finance laws provide for reporting requirements both before and after the primary and general elections.
In one of the complaints, case No. 04-36, the NADC focused on Hergert's alleged failure to file a required affidavit of campaign spending. This affidavit was required to be filed when Hergert expended 40 percent of his estimated maximum expenditures for the general election (forty-percent affidavit). When a candidate files a forty-percent affidavit, it permits disbursement of public campaign funds to an opposing candidate who is otherwise qualified and has agreed to abide by voluntary campaign spending limits. Because Hergert did not file his forty-percent affidavit until after the general election, public funds were not released to Hergert's opponent for the general election, although the opponent was entitled to public funds. A central issue of the investigation in case No. 04-36 was the "triggering" date requiring Hergert to file the forty-percent affidavit.
The NADC investigated complaints against Hergert throughout the fall of 2004 and into the spring of 2005. Based upon these complaints, in April 2005, the NADC and Hergert entered into settlement agreements, in which Hergert agreed to pay $33,512.10 in civil penalties and late filing fees for violations of campaign finance laws. As part of the settlement agreements, Hergert admitted in one complaint, case No. 04-36, that he had filed his forty-percent affidavits in both the primary and general elections after the specified time limit for filing the affidavits had expired.
In July 2005, after the settlement agreements were approved, the Nebraska State Patrol initiated an independent investigation of Hergert's campaign activities. On April 12, 2006, the Legislature adopted resolution No. 449, which set forth 10 articles of impeachment against Hergert.
Pursuant to Neb. Const. art. III, § 17, a special session of this court was called to try the articles of impeachment. We focus only upon article III, "False Reporting," and article V, "Obstructing Government Operations." We find Hergert guilty of both.

II. ARTICLES OF IMPEACHMENT
Legislative resolution No. 449 contains 13 paragraphs of the Legislature's general findings, followed by the 10 articles, which are divided into two sections. Articles I through VI are based on allegations of misconduct occurring on or after January 6, 2005, the date on which Hergert was sworn into office. Articles VII through X are based on allegations of misconduct occurring before January 6. Each article contains multiple allegations and a specific statute or constitutional provision that the Legislature contends was violated by Hergert's misconduct. We summarize the Legislature's charges.
*379 In articles I through VI, the Legislature charges Hergert with the following: (1) falsely swearing his oath of office because his campaign filings allowed him to improperly influence voters and the constitutional oath requires officers to swear they have not committed such acts; (2) violating federal mail fraud statutes through his false and deceptive campaign filings; (3) falsely reporting the date of a material expenditure in his January 11, 2005, campaign statement; (4) in October 2005, making false statements during a State Patrol interview; (5) obstructing government operations by falsely reporting the date of a material expenditure in his January 11, 2005, campaign statement; and (6) in October 2005, obstructing government operations by making false and intentionally misleading statements during a State Patrol interview.
As noted, the remaining articles of impeachment are related to Hergert's preincumbency conduct. In articles VII through X, the Legislature charges Hergert with the following: (7) intentionally failing to timely file his forty-percent affidavits in both the primary and general election periods; (8) intentionally omitting material expenditures from his October 25, 2004 campaign statement; (9) intentionally accepting loans that exceeded 50 percent of his campaign committee's nonloan receipts; and (10) falsely and intentionally reporting the date that his committee borrowed $44,000.

III. STATUTORY SCHEME
A candidate for an elective state office is "responsible for filing all statements and reports required to be filed by his or her candidate committee" pursuant to two legislative acts. Neb.Rev.Stat. § 49-1447(2)(b) (Reissue 2004). The first act is the Nebraska Political Accountability and Disclosure Act (NPADA), Neb.Rev.Stat. §§ 49-1401 to 49-14,141 (Reissue 2004). The second act is the Campaign Finance Limitation Act (CFLA), Neb.Rev.Stat. §§ 32-1601 to 32-1614 (Reissue 2004).
Generally, the NPADA requires candidates for elective state office to form candidate committees and file campaign statements with the NADC once the candidate has raised, received, or expended $5,000 in a calendar year. § 49-1445. The NPADA requires candidate committees to file two preelection campaign statements and one postelection campaign statement for both the primary and general elections. See §§ 49-1454 and 49-1459.
Candidates for certain elective state offices, including the office of regent, are also required to file an affidavit stating whether they intend to abide by the voluntary campaign spending limits for the office under the CFLA. See § 32-1604.01(1). Abiding candidates agree to spend no more than 50 percent of the total campaign spending limit during the primary. See § 32-1604(3). For the office of regent, the total campaign spending limit, excluding specified unrestricted spending, is $50,000. Id. Therefore, the spending limit for the primary is $25,000.
If a candidate for a covered office files an affidavit stating an intent not to abide by the voluntary spending limit, then the candidate must include in the affidavit a reasonable estimate of his or her maximum expenditures for the primary election, which estimate may be amended up to 30 days before the primary election. § 32-1604(5)(a). The nonabiding candidate must also file an estimate for the general election by the 40th day following the primary election, which estimate may be amended up to 60 days before the general election. Id. A candidate is free to estimate expenditures at an amount greatly above or below the voluntary spending limit.
*380 For both the primary and general election periods, when the nonabiding candidate expends 40 percent of his or her estimated maximum expenditures, he or she must notify the NADC via the forty-percent affidavit "no later than five days after the forty percent has been expended." § 32-1604(5)(b).
The NADC is required to "[p]rescribe forms for statements and reports that are required to be filed [under both the NPADA and CFLA] and furnish such forms to persons required to file such statements and reports," as well as to distribute these forms to the appropriate local officials. § 49-14,123(2) and (13).

IV. EVIDENCE PRESENTED AT TRIAL
We begin with a summary of the articles of impeachment that control the disposition of this case. In article III, "False Reporting," the Legislature alleged that after the NADC initiated an investigation into Hergert's campaign activities, he filed a required postelection campaign statement for the general election on January 11, 2005. The Legislature alleged that this campaign statement contained false and deceptive information in violation of Neb.Rev.Stat. § 28-907 (Cum. Supp. 2004). Specifically, the Legislature alleged that Hergert reported in this statement that he incurred an expenditure to the Jackson-Alvarez Group (Jackson-Alvarez) on December 14, 2004, when the expense was actually incurred no later than October 5, 2004.
In article V, entitled "Obstructing Government Operations," the Legislature charged that the January 11, 2005, campaign statement constituted intentional obstruction of government operations, in violation of Neb.Rev.Stat. § 28-901 (Reissue 1995). The Legislature alleged that Hergert knowingly furnished materially false information in this campaign statement, including the Jackson-Alvarez expenditure, with the intent of impeding a criminal investigation.
In these articles, the Legislature essentially alleges that while the NADC was investigating the triggering date for Hergert's forty-percent affidavit, he falsely reported the date he incurred the Jackson-Alvarez expenditure. The Legislature charges that by falsely reporting the date of this expenditure, Hergert intended to conceal from the NADC the actual date that he exceeded 40 percent of his estimated expenditures in the general election. The Legislature further alleges that this concealment obstructed the investigation into the case focusing on the forty-percent affidavit.

1. EVIDENCE ADDUCED OF EVENTS BEFORE HERGERT TOOK OFFICE
The statewide primary election in 2004 was held on May 11. The statewide general election in 2004 was held on November 2.
On February 17, 2004, Hergert filed as a candidate for the Board of Regents. Also on February 17, Hergert filed his statement of financial interests with the NADC, identifying himself as a candidate for the Board of Regents. On March 3, Frank Daley, the executive director of the NADC, sent a letter to Hergert, acknowledging receipt of Hergert's statement of financial interests and notifying Hergert that he would have further responsibilities under Nebraska's campaign finance laws once he raised, received, or spent $5,000 for his candidacy. Daley also informed Hergert that if he had not already received from local officials a copy of the NADC's candidate brochure to assist new candidates in complying with these obligations, he could obtain one from the NADC.
*381 In March 2004, Hergert asked Michael Jacobson, president and CEO of Nebraskaland National Bank in North Platte, Nebraska, to be his committee treasurer. Jacobson initially declined to be Hergert's treasurer because of time constraints. After Hergert promised to prepare the reports and forward them to Jacobson to sign and to send to the NADC, Jacobson agreed to be the treasurer in name only and to allow Hergert to use his name in campaign advertising. Both Hergert and Jacobson then agreed Jacobson would have no responsibility for keeping committee records of receipts, accounts, or expenditures. Jacobson had no authority regarding the committee's checking account at the Valley Bank and Trust Company in Gering, Nebraska.
On April 13, 2004, the NADC received Hergert's candidate committee's statement of organization. See § 49-1449 (requiring committee to file statement of organization within 10 days of formation). This statement listed Hergert's home address in Mitchell, Nebraska, as the address the committee would use for correspondence between the NADC. The statement listed April 5 as the date the committee had raised, received, or expended over $5,000. The statement also listed Valley Bank and Trust Company as the committee's official depository, listed Jacobson as the committee treasurer, and gave Jacobson's North Platte mailing address. No other committee members were named.
On April 13, 2004, the same day that Hergert filed his statement of organization, he also filed an affidavit with the NADC, swearing that he did not intend to abide by the campaign spending limits and that $65,000 was a reasonable estimate of his maximum expenditures for the primary election. The form affidavit for this report included a statement above the signatory line that the candidate understands he or she must file a forty-percent affidavit when 40 percent of the estimated maximum expenditure has been spent, if the candidate's estimate exceeds $25,000, the voluntary spending limit for the primary.
Also on April 13, 2004, Daley sent a letter to Jacobson at Hergert's home address. Daley informed Hergert that the committee's first primary campaign statement was late. Daley requested that the committee inform the NADC if the committee wished to receive correspondence at an address other than the one provided in the committee's statement of organization. Daley's letter further set forth every reporting period and due date for the primary and general election campaign statements, as follows:

 Report Due Date Reporting Period
 1st Primary April 12, 2004 through April 6, 2004
 2nd Primary May 3, 2004 April 7, 2004 through April 26, 2004
 Post Primary June 21, 2004 April 27, 2004 through June 15, 2004
 1st General October 4, 2004 June 16 through September 28, 2004
 2nd General October 25, 200[4] September 29 through October 18, 2004
 Post General January 11, 2005 October 19 through December 31, 2004

Finally, Daley explained that because Hergert estimated his maximum expenditures for the primary at $65,000, he was required to file his forty-percent affidavit within 5 days of the committee's spending more than $26,000.
In addition to alerting Hergert in March 2004 to the availability of the NADC's candidate brochure, the NADC sent Hergert's committee two publications explaining its responsibilities under Nebraska's campaign finance laws: the "Candidate Committee Treasurer's Guide" and the *382 "CFLA Candidate Brochure." The latter document provided information specific to the office of regent and, again, a calendar of important due dates for the 2004 election. Both documents detailed the NADC's filing requirements with examples.
On April 21, 2004, Daley again wrote Jacobson at Hergert's home address and at Jacobson's mailing address in North Platte, stating that the first campaign statement had still not been filed. Daley reiterated it was Hergert's responsibility to file a forty-percent affidavit within 5 days after spending $26,000 and enclosed a form for that purpose.
On May 5, 2004, Daley wrote directly to Hergert at his home address, stating that Hergert's second primary campaign statement, filed May 3, showed his committee had spent a total of $48,444.10 for the primary campaign. Daley informed Hergert that he had failed to file an affidavit within 5 days of spending 40 percent of his estimated maximum expenditures. Daley requested that Hergert send in the affidavit immediately.
Based on Hergert's May 3, 2004, campaign statement, Don Blank, the incumbent and one of the abiding candidates in the primary, was entitled to, and received, an additional $40,000 in public funds. Because of Hergert's delay in filing his forty-percent affidavit, however, Blank did not receive these public funds until 5 to 6 days before the primary. See § 32-1604(6).
On May 11, 2004, the primary election was held. Of the four nonpartisan candidates, Blank and Hergert advanced. On May 12, the day after the primary election, the NADC received Hergert's delinquent forty-percent affidavit. In the affidavit, he swore that he had spent 40 percent of his estimated maximum expenditures on April 22, 2004. The preprinted forty-percent affidavit is a one-page form. Instructions on the form advise nonabiding candidates that they must file the affidavit within 5 days after spending 40 percent of their estimated expenditures and that failure to do so renders the candidate subject to criminal prosecution.
On May 24, 2004, the NADC assessed $225 in late filing fees to Hergert's committee for failing to timely file his first campaign statement for the primary election. Hergert was later fined for failing to timely file his late forty-percent affidavit in the primary as part of the April 2005 settlement agreements with the NADC.
On June 21, 2004, the NADC received Hergert's postprimary campaign statement and his estimate of maximum expenditures for the general election. In his estimate, Hergert swore that $25,000 was a reasonable estimate of his expenditures for the general election. Daley testified that given this estimate, Blank, the incumbent regent, would not be entitled to public funds in the general election period because Hergert's estimate did not exceed the $25,000 voluntary spending limit for the general election period. This is true notwithstanding Hergert's expenditures of $61,701.95 for the primary election. On September 3, the last date to amend the estimate, the NADC received an amended affidavit from Hergert, in which he swore that $40,000 was a reasonable estimate. Daley testified that because of the amended affidavit, Blank was entitled to $15,000 in public funds-the difference between the voluntary spending limit and Hergert's estimate-upon Hergert's expenditure of 40 percent of his $40,000 estimate, or $16,000.
On September 7, 2004, Mark Hinman, the deputy director for the NADC, wrote a letter to Hergert's campaign committee at the address identified at trial as Hergert's home address. Hinman reminded the committee that a candidate must file a *383 forty-percent affidavit within 5 days of spending 40 percent of his or her estimated maximum expenditures. Hinman also warned that a candidate who is required to file this affidavit and fails to do so is subject to criminal prosecution.

(a) Expenditures Triggering Filing of Hergert's Forty-Percent Affidavit
The Legislature's case against Hergert in articles III and V is grounded in his alleged concealment of the actual date that he expended 40 percent of his maximum estimated expenditures for the general election. The date Hergert expended 40 percent of his estimate was the triggering date requiring Hergert to file his forty-percent affidavit within 5 days. The following facts are relevant to that triggering date:
In late September or early October 2004, Hergert, on the suggestion of a political consultant, approved an expenditure to Jackson-Alvarez to do research on Blank's political activities while a regent. Based on his communications with the consultant, Hergert believed that the research would cost around $7,000 to $8,000.
The evidence shows that Jackson-Alvarez' representative had completed his research at the University of Nebraska by the last week in September 2004. On October 5, Jackson-Alvarez' representative asked for a final cost for copies of records he had requested. On October 6, the university's administrator reported that the remaining copies would be sent "within the day."
On September 30, 2004, the NADC received Hergert's first campaign statement for the general election, covering the period from June 16 to September 28. The statement showed that his committee's total expenditures were $5,544.53 for the period from June 16 to September 28. Total receipts for the period were reported as $5,125.
Hergert received Jackson-Alvarez' report no later than the middle of October 2004. The contents of the Jackson-Alvarez report were used in Hergert's late-campaign advertising against his opponent, Blank. Jackson-Alvarez completed its work before Hergert was invoiced by the vendors that he hired to coordinate or execute Hergert's late-campaign advertisements. Those vendors included: (1) Majority Strategies, which invoiced the committee on October 13, 2004, at Hergert's home address for $10,456.55; (2) Scott Cottington, Inc., which invoiced the committee on October 17 for $36,000; and (3) the Nebraska Press Association, which faxed a quote of $9,847.62 to Hergert on October 19.
October 18, 2004, was the closing date for the second general election campaign statement. See § 49-1411 ("[c]losing date shall mean the date through which a campaign statement is required to be complete"). Although not listed on that campaign statement, the evidence shows that on October 19, Hergert's committee paid $36,000 to Scott Cottington, Inc., and $10,456.55 to Majority Strategies, and that on October 21, the committee paid $9,847.62 to the Nebraska Press Association. On October 21, Hergert signed a promissory note for $65,100 to Valley Bank and Trust Company for an open line of credit, allowing multiple advances to be drawn against the principal loan amount. Hergert took the loan out specifically because at the time the three above-referenced checks were written for radio, newspaper, and television advertising, the committee's checking account had insufficient funds to cover them.
The evidence shows that the bank was to deposit advances from Hergert's loan into the committee's checking account *384 when checks were presented for payment. The committee's bank statements show that on October 22, 2004, the bank transferred a $44,000 advance from Hergert's loan to the committee's checking account. On the same day, the bank paid and deducted from the committee's checking account the checks made payable to Scott Cottington, Inc., and Majority Strategies, totaling $46,456.55. By November 5, the bank had transferred $62,500 to the committee's checking account in loan advances.
On October 25, 2004, the NADC timely received from Hergert, by Federal Express, Hergert's second general election campaign statement for the period covering "Sept 28 [sic] 2004 TO Oct 18 2004." In the summary of expenditures, the statement showed that total expenditures for the period were $6,456.08 and that total receipts for the period were $5,808.30. The statement, however, did not include the required listing of the committee's unpaid bills and other accrued expenses. Thus, through October 18  the closing date for Hergert's last preelection campaign statement-Hergert's campaign statements showed that the committee's total expenditures for the general election period were $12,000.61 and that its total receipts were $10,933.30.
On November 2, 2004, Hergert was elected to the Board of Regents. On November 3, the NADC received from Hergert two separate reports of late contributions to his campaign. The first late contribution was reported as received on October 26, and listed the $44,000 loan from Valley Bank and Trust Company.
On November 12, 2004, the NADC received by Federal Express Hergert's notarized and fully signed forty-percent affidavit and an attached letter. Although Scott Cottington, Inc., had been paid $36,000 on October 19, Hergert swore that he expended 40 percent, or $16,000, of his maximum estimated expenditures of $40,000 for the general election on October 26, 2004. In the accompanying letter, Hergert stated that he had mailed his forty-percent affidavit to the NADC on October 29, but was advised by a member of the media on November 9 that the NADC had not received his filing. He further stated in the letter that "[t]here is a possibility of this report being misplaced..." in his office because October 29 was also the date that several hundred monthly invoices were mailed from his office. As noted, forty-percent affidavits are due "no later than five days after the forty percent has been expended." § 32-1604(5)(b).
Because Hergert's forty-percent affidavit was not filed until after the general election, no public funds were disbursed to Blank for the general election. Daley testified that Hergert's preelection campaign statements did not disclose that he had exceeded 40 percent of his estimated expenditures. See § 32-1604(6) (prohibiting disbursement of public funds to abiding candidate unless nonabiding opponent files forty-percent affidavit or nonabiding opponent's preelection campaign statements or NADC audits reveal that nonabiding opponent made expenditures exceeding 40 percent of his or her maximum estimated expenditures).

(b) NADC Complaints and Investigation
Shortly after Hergert was elected, three separate complaints were filed with the NADC regarding Hergert's conduct during the campaign. These complaints became cases Nos. 04-35, 04-36, and 04-43. An additional complaint was filed in May 2005 but is not relevant to our analysis.
Case No. 04-35 involved Hergert's failure to report the late contribution of $44,000 within 2 days of his committee's receipt of the loan proceeds on October 26, 2004. Case No. 04-43 involved Hergert's unlawful receipt of $49,000 in loans on *385 October 26 and 29. This amount was greater than 50 percent of the committee's receipts from sources other than loans at the time the loans were accepted. See § 49-1446.04(1) (prohibiting candidate committees from accepting, after 30 days of formation, loans greater than 50 percent of committee's receipts, excluding loan proceeds).
The complaint filed in case No. 04-36 ultimately resulted in the Legislature's charges in articles III and V. On November 4, 2004, Daley received a letter from Blank, alleging facts that, according to Blank, showed (1) Hergert's committee had made expenditures which should have triggered the filing of Hergert's forty-percent affidavit and (2) the committee should have reported those expenditures on Hergert's second campaign report filed on October 25. On Daley's recommendation, the NADC commenced an investigation, which became case No. 04-36, looking into Hergert's alleged violation of § 32-1604(5)(b) because he failed to file a forty-percent affidavit until after the general election. Daley sent the notification of this investigation to Hergert on November 12.
On November 22, 2004, Hergert's attorney, Kermit Brashear, wrote Daley to request more time to respond to the allegations because of the upcoming holidays. In the letter. Brashear stated: "Hergert prepared the 40 Percent Affidavit on behalf of the Committee, and believes in good faith that he placed same with the United States Postal Service on October 29, 2004, addressed to the [NADC]."
On November 30, 2004, pursuant to these three complaints, the NADC commenced an audit of the committee's records, covering the period from June 1 through December 31, 2004. The audit required the committee to provide its records of receipts and expenditures, including: bank statements, contribution records, deposit slips, canceled checks, invoices, billing statements, contracts, and any other records relevant to receipts and expenditures.
On December 9, 2004, William Howland, general counsel for the NADC, wrote to Brashear and specifically responded to Brashear's contention that Hergert believed in good faith he had mailed his forty-percent affidavit on October 29:
The facts and circumstances surrounding his belief is an area that I am interested in pursuing by way of a deposition of ... Hergert. I believe that's probably the quickest way to get to the resolution of this matter.
....
... I would also like to have you check your calendar and ... Hergert's for possible dates for a deposition.
On December 21, 2004, Brashear sent to the NADC the committee's records from June 1 through December 8, 2004, including its bank statements, a summary of the committee's banking transactions (i.e., a check register), deposit slips, and copies of invoices through December 8. The NADC investigations were ongoing when Hergert took office on January 6, 2005, and when Hergert filed his postelection campaign statement on January 11.

2. EVIDENCE ADDUCED OF EVENTS AFTER HERGERT'S ASSUMING OFFICE
On January 6, 2005, Hergert was sworn into office. On January 11, the NADC received Hergert's postelection campaign statement for the general election, covering the period from "October 18 [sic] 2004 TO December 31 2004." Hergert's signature on the report bears a date of January 4. Jacobson's signature was dated January 10. On January 10, after Charlotte Herrell, the office manager for Hergert's businesses, had sent the completed campaign statement to Jacobson to sign and to file, *386 she faxed to Jacobson two pages which were to be substituted and placed in the report before filing. The two substitute pages are identifiable by the fax inscription at the top of each page from "Hergert Milling, Inc.," dated January 10, 2005.
The first substituted page summarizes the committee's receipts, expenditures, and cash balance. The second substituted page is the required listing of the committee's unpaid bills and other accrued expenses. On the second page, Hergert reported that the committee had incurred an unpaid expenditure of $13,272.66 to Jackson-Alvarez on December 14, 2004. According to Hinman's testimony, the two pages are not related, i.e., the total of unpaid expenditures from the unpaid bills section of the campaign statement is not brought forward in the summary page.
Hergert also reported borrowing $62,500 from Valley Bank and Trust Company on October 22, 2004. A typewritten insertion listed $59,907.20 in paid expenditures over $250. These expenditures included: (1) $36,000 paid to Scott Cottington, Inc., on October 19; (2) $10,295 paid to Majority Strategies on October 19; and (3) $9,727.13 paid to the Nebraska Press Association on October 21. The committee's total expenditures for the period were reported as $75,923.07.
On January 31, 2005, the NADC received Hergert's annual campaign statement for his committee, signed by Hergert and Brenda Spath as the committee's new treasurer. Spath was an employee of one of Hergert's businesses. The annual statement did not list the Jackson-Alvarez expenditure as either a paid or an unpaid expenditure.
On February 15, 2006, Hinman wrote to Spath at Hergert's home address to ask why the reported expenditure to Jackson-Alvarez in the January 11 filing was not listed as either a paid or an outstanding bill in the annual statement. On February 23, the NADC received Spath's response: "[P]lease be advised check 1065 was paid to Jackson-Alvarez Group in the amount of $13,272.66." Spath did not provide a date for this payment or a copy of the check. Contrary to Spath's representation, the record shows the amount of check No. 1065 was actually $13,978.98 and that it was paid out of the committee's checking account on April 21, 2005. The date on the face of the check to Jackson-Alvarez appears to be March 4, 2005. The check notation provides that it was written for "legal fees."
At some point after the NPADA complaints were filed, Daley and Howland met with the Attorney General, who deferred jurisdiction to the NADC in the Hergert investigations. On March 7, 2005, Brashear wrote Howland and offered to settle the existing complaints against Hergert for $34,522.10, on the condition that no criminal charges be initiated, that Hergert's deposition be canceled, and that the offer constitute a complete resolution of all pending matters. On March 8, Howland responded to Brashear in writing. In that letter, Howland stated:
One last concern that I want to mention is that I noticed that the [January 11 campaign statement] shows a negative balance on the campaign account in the amount of $12,349.83 along with an unpaid bills balance of $13,272.66 both of which will have to be paid from contributions from the candidate or others and not from additional loans.
In April 2005, the NADC approved all the settlements, which required Hergert to pay a total of $33,512.10 in late filing fees and civil penalties.
In July 2005, the Nebraska State Patrol initiated an independent investigation and interviewed Hergert on October 8, *387 2005. During that interview, Hergert claimed that he delinquently filed, on November 3, 2004, the report of the $44,000 late contribution because he had forgotten to sign the report before he left to go on a campaign trip. When asked why he had used October 26, 2004, on the report as the date that he received the $44,000 loan, Hergert stated that he did not prepare the report and relied on his office staff for the accuracy of all his reports. He also attempted to distinguish a line of credit from a loan: "[W]hen that [late contribution] report was due, they [his office staff] just called there and said what is the balance on the note. And took it off the balance. It wasn't a loan that day, that was just the balance of, of the account that day." Similarly, he did not know why the January 11, 2005, campaign statement showed that the bank had loaned his committee $62,500 on October 22, 2004, instead of October 26, because he did not prepare the January 11 report.
Hergert denied knowing that Scott Cottington, Inc., had invoiced his committee on October 17, 2004. He admitted knowing that Jackson-Alvarez had completed its work in early October, admitted his belief that the firm's research would cost $7,000 to $8,000, but stated that he did not report the expense because Jackson-Alvarez had not billed the committee. Hergert also stated that he determined the date of an expenditure was the date a check cleared the bank. He admitted, however, that he did not verify when a check had cleared.
Hergert stated that only the treasurer and those preparing his reports would know whether any of his expenditures were reported after the date they were incurred. He stated that he did not instruct his staff when to report expenses because he had not read the NADC's candidate's handbook. Finally, Hergert stated during the interview that once he learned the NADC had not received his forty-percent affidavit, he and Herrell "tore up the office" looking for the form until he finally instructed her to use a duplicate form from his files. Hergert claimed that a month later, he found the original forty-percent affidavit form in a "chicory file" for one of his businesses.
After the Legislature adopted its resolution of impeachment, the Legislature's counsel deposed Hergert on May 2, 2006. Hergert testified that he self-directed his campaign, but admitted that he had not made any effort to acquaint himself with the NADC regulations or to read its publications. Hergert testified that he told Herrell to alert him when the committee had spent 40 percent of his estimated expenditures. He repeated his contention that he considered a payment made when it cleared the bank for the purpose of triggering the requirement of sending in his forty-percent affidavit.
Hergert also testified that he had learned since his interview with the State Patrol that he was not required to sign late contribution reports and that he did not know why the $44,000 contribution was reported late. He stated that he did not learn until later that the loan advance had been made on October 22, 2004, instead of October 26.
Hergert admitted receiving the Jackson-Alvarez report by mid-October 2004 and using its contents in his advertising. He further admitted that Jackson-Alvarez had completed its work before he was invoiced by Majority Strategies on October 13 and Scott Cottington, Inc., on October 17, and before the Nebraska Press Association quoted him a price on October 19. He also admitted that Jacobson was not responsible for the content of any of his reports and that he told Herrell what date to put on the forty-percent affidavit. *388 When asked why he choose October 26 as the date to use for his forty-percent affidavit, he stated, "I had received a call from Cottington and said he hadn't received the money, and would I make sure that it was made available, so I determined that that was the date we made it available." Although he admitted that he wrote the $36,000 check to Scott Cottington, Inc., on October 19, he stated that he did not use that date because the check had not cleared the bank.
Hergert denied (1) that he directed Herrell to make corrections to his January 11, 2005, campaign statement; (2) that he directed Herrell to fax the substitute pages to Jacobson on January 10, to place in the January 11 filing; or (3) that he saw the faxed pages before his deposition. When asked about events in October 2004, Hergert testified that he last spoke to someone at Jackson-Alvarez in the middle of October 2004 and that neither he nor anyone in his campaign had communicated with the firm, directly or indirectly, since that time, including all of 2005 and 2006.
Yet, when asked why he had reported the Jackson-Alvarez bill as accrued on December 14, 2004, Hergert responded: "I don't know. We were notified that we owed this amount." But Hergert was unable to say who from Jackson-Alvarez had made the contact, who had received the notification, or whether the contact was made via a telephone call. Hergert stated that he used the date he was notified because he knew the work was completed. Although he delayed payment until March or April 2005 because he contested the amount of the "claim," Hergert did not use the date the check cleared the bank, April 21, 2005, as the date he incurred the expenditure.
During trial, Herrell testified that she determined when to send in the campaign statements and that she used the date a check was written to a vendor as the expenditure date. She testified that she only signed campaign checks at Hergert's direction. In contrast to Hergert's deposition testimony, Herrell stated that she was never told that she should not list an expenditure until she could look at the back of the check to see if it had cleared the bank or until she had received a canceled check from the bank. She testified that Hergert never spoke to her about the forty-percent affidavit being lost, other than to dictate the letter he sent to the NADC accompanying his late filing in November 2004. She also testified that she relied on Hergert to tell her when to send in the forty-percent affidavits and reports of late contributions. Hergert admitted during his trial testimony that he was responsible for the dates of these filings. He again admitted that Jackson-Alvarez had completed its work by the time he received its report in mid-October and maintained that he had never received an invoice from them.
Regarding the January 11, 2005, filing, Herrell testified that she faxed the substituted pages to Jacobson at Hergert's direction. The parties stipulated that Jacobson's assistant would testify, if called as a witness, that she was contacted by telephone and asked to make this substitution before sending the report to the NADC. Herrell also testified that she never saw any invoice from Jackson-Alvarez and that Hergert provided her the information about that expenditure reported in the January 11 campaign statement.

V. FINDINGS OF FACT, ANALYSIS, AND CONCLUSIONS OF LAW

1. IMPEACHABLE OFFENSE: MISDEMEANOR IN OFFICE
Article III, § 17, of the Nebraska Constitution sets forth the procedures *389 for impeaching a civil officer of this state and provides in part that "[t]he Legislature shall have the sole power of impeachment, but a majority of the members elected must concur therein." Upon the Legislature's adoption of a resolution of impeachment against any civil officer other than a member of this court, a special session of this court must be called to try the articles of impeachment. A conviction of impeachment requires "the concurrence of two-thirds of the members of the Court of impeachment" that the officer is guilty of "one or more impeachable offenses." Neb. Const. art. III, § 17. Article IV, § 5, provides: "All civil officers of this state shall be liable to impeachment for any misdemeanor in office."
This court first sat as an impeachment court in 1893, for the impeachment trials of members of the board of public lands and buildings, who were accused, inter alia, of failing to oversee the operations of a contractor who defrauded the State. See, State v. Hastings, 37 Neb. 96, 55 N.W. 774 (1893); State v. Leese, 37 Neb. 92, 55 N.W. 798 (1893); State v. Hill, 37 Neb. 80, 55 N.W. 794 (1893). The impeachment proceedings in Leese and Hill were dismissed because this court has no jurisdiction to try accusations arising from articles of impeachment adopted after a state officer has resigned or his or her term has expired. See, Leese, supra; Hill, supra. In Hastings, however, the court reached the issues on the merits and provided a comprehensive discussion of an "impeachable misdemeanor" under the Nebraska Constitution:
[T]he vital question in this case [is] what under our constitution amounts to an impeachable misdemeanor? [I]n its solution, we have endeavored to adopt the rule best sanctioned by authority and which is just, alike to the state and its servants. [W]e are constrained to reject... the doctrine that an impeachable misdemeanor is necessarily an indictable offense, as too narrow and tending to defeat rather than promote the end for which impeachment as a remedy was designed and not in harmony with the fundamental rules of constitutional construction. On the other hand, the contention [that] the term misdemeanor in office is not susceptible of a legal definition, but that every such proceeding should be determined upon the facts in the particular case, is, to say the least, strikingly illogical.... The sound rule... lies midway between the two extremes.... "[A]n impeachable high crime or misdemeanor is one in its nature or consequences subversive of some fundamental or essential principle of government or highly prejudicial to the public interest, and this may consist of a violation of the constitution, of law, of an official oath. or of duty by an act committed or omitted, or, without violating a positive law, by the abuse of discretionary powers from improper motives or for an improper purpose."... It may be safely asserted that where the act of official delinquency consists in the violation of some provision of the constitution or statute which is denounced as a crime or misdemeanor, or where it is a mere neglect of duty willfully done, with a corrupt intention, or where the negligence is so gross and the disregard of duty so flagrant as to warrant the inference that it was willful and corrupt, it is within the definition of a misdemeanor in office. But where it consists of a mere error of judgment or omission of duty without the element of fraud, and where the negligence is attributable to a misconception of duty rather than a willful disregard thereof, it is not impeachable, although it may be highly prejudicial to the interests of the state.
*390 (Emphasis supplied.) Hastings, 37 Neb. at 114-17, 55 N.W. at 780.
The italicized text in this passage defining an impeachable misdemeanor was later adopted as being "equally applicable today" in State v. Douglas, 217 Neb. 199, 202, 349 N.W.2d 870, 874 (1984). The Douglas court also clarified that "the act or omission for which an officer may be impeached and removed from office must relate to the duties of the office." Id. at 201, 349 N.W.2d at 874. Thus, under both Hastings and Douglas, three categories of conduct may constitute an impeachable offense by a state officer:
(1) An act that violates a statute, constitutional provision, or oath and is related to the officer's duties;
(2) A simple neglect of duty committed for a corrupt purpose; or
(3) A neglect or disregard of duty that is so gross or flagrant, the officer's willful and corrupt intent may be inferred.

2. STANDARD OF PROOF
In 1986, the procedural requirements of article III, § 17, were amended to provide, inter alia, that an impeachment trial "shall be conducted in the manner of a civil proceeding" and that the standard of proof for a conviction of impeachment shall be "clear and convincing evidence." 1986 Neb. Laws, L.R. 318.
In his answer and his brief, Hergert argues that the articles of impeachment violate his constitutional right to due process because
the Legislature is attempting to utilize its power of impeachment to convict ... Hergert of these crimes outside of a criminal court. [T]his violates the United States Constitution because it seeks to try criminal charges ... on a standard less than "beyond a reasonable doubt." When the Nebraska Constitution was amended to lower the burden of proof in impeachment cases, the amendment effectively stripped the Court of impeachment of the power to try criminal charges as a matter of first impression.
Closing trial brief for defendant at 28. We interpret Hergert's due process argument as a claim that because the Nebraska Constitution provides merely for a "clear and convincing" standard of proof for impeachment, this court cannot find that an officer is guilty of any article of impeachment based upon conduct described and prescribed by a criminal statute. This claim mischaracterizes the proceeding before us, which is an impeachment trial and not a trial on criminal charges.
The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."
Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (quoted in Lynch v. Nebraska Dept. of Corr. Servs., 245 Neb. 603, 514 N.W.2d 310 (1994)). In a criminal case, due process requires the prosecution to prove, beyond a reasonable doubt, every factual element necessary to constitute the crime charged. Benitez v. Rasmussen, 261 Neb. 806, 626 N.W.2d 209 (2001). In civil cases, however, when a party's interests are substantial, involve more than the mere loss of money, but obviously do not involve criminal conviction, due process is satisfied by an intermediate standard of proof that generally employs terms similar to "clear and convincing." Addington, supra.
As a court of impeachment, this court is concerned with Hergert's conduct and the significance of such conduct *391 as it bears on the allegations in the articles of impeachment. We are not concerned with whether such conduct could result in criminal conviction or acquittal under the criminal statutes noted in the articles of impeachment. Our role as fact finders under article III, § 17, is limited to finding whether the Legislature has shown by clear and convincing evidence that Hergert is guilty of "one or more impeachable offenses."
The phrase "misdemeanor in office." as that phrase is used in article IV. § 5, to define an impeachable offense, is a term of art, and the word "misdemeanor" in this phrase is not used as it is in a criminal context. As this court held in State v. Hastings, 37 Neb. 96, 55 N.W. 774 (1893), an officer's conduct need not rise to the level of an indictable offense to be considered an impeachable offense.
Additionally, article III, § 17, limits this court's judgment to "removal from office and disqualification" to hold other state offices. Section 17 specifically provides that "the party impeached, whether convicted or acquitted, shall nevertheless be liable to prosecution and punishment according to law." Thus, the Nebraska Constitution explicitly provides that a conviction of impeachment is not the same as criminal conviction and that impeachment sanctions cannot rise to the level of criminal punishment. Because criminal conviction is not at stake in an impeachment proceeding, a "beyond a reasonable doubt" standard of proof is not required. Addington, supra.
Our inquiry is limited to whether Hergert violated his duties to the public as a constitutional officer of this state, that is, whether he has committed a "misdemeanor in office." Whether Hergert should be impeached does not depend upon whether he could be convicted of violating a criminal statute, but upon whether his alleged conduct is "`"in its nature or consequences subversive of some fundamental or essential principle of government or highly prejudicial to the public interest...."'" State v. Douglas, 217 Neb. 199, 202, 349 N.W.2d 870, 875 (1984), quoting Hastings, supra. Hergert's due process rights are fully protected by a clear and convincing standard of proof. We reject this constitutional argument.

3. RELEVANCY OBJECTIONS
During trial, Hergert asked for and was granted a continuing relevancy objection to evidence of his conduct prior to taking office, which objections this court took under advisement. In Nebraska, this issue would not arise if Hergert's conduct had occurred while he was an incumbent seeking reelection because our impeachment statutes specifically provide that a state officer may be impeached "notwithstanding the offense for which said officer is tried occurred during a term of office immediately preceding." Neb.Rev.Stat. § 24-109 (Reissue 1995).
However, even in states where an officer may not be impeached for acts committed in a previous term, a court may nonetheless consider those acts "in so far as they are connected with or bear upon [the officer's] general course of conduct during the second term, for the limited purpose of inquiring into the motive and intent of the respondent as to the acts and omissions charged to [the officer] during the second term." State, ex rel. Attorney General v. Hasty. 184 Ala. 121, 126, 63 So. 559, 561 (1913).
We agree with this reasoning and conclude that such reasoning is equally applicable to an officer's preincumbency conduct. Thus, we determine that in an impeachment proceeding, an officer's preincumbency conduct is relevant to the *392 extent it bears upon the officer's pattern of conduct and shows the officer's motives and intent as they relate to the officer's conduct while in office. Thus, this objection is overruled and the evidence will be considered for this limited purpose.

4. ARTICLES III AND V: FALSE REPORTING AND OBSTRUCTION OF GOVERNMENT OPERATIONS
Article III alleges "False Reporting," and article V alleges "Obstructing Government Operations." The Legislature's allegations in article III, paragraphs 1, 2, and 4, are virtually identical to the corresponding paragraphs in article V. Therefore, we set out all the paragraphs of article III and only paragraph 3 of article V. In article III, the Legislature alleged:
1. During the final calendar quarter of 2004, the Commission initiated one or more investigations of C. David Hergert after receiving two complaints from citizens and initiating an internal complaint within the Commission. The Commission is empowered by law to conduct criminal investigations and has concurrent jurisdiction with the Attorney General to prosecute election crimes as provided by Neb Rev Stat § 49-14,126. Hergert was informed of the investigations and entered into a series of submissions of information and communications with the Commission about the matters under investigation.
2. Thereafter, Hergert prepared or caused to be prepared, signed, and filed on January 11, 2005 his Campaign Statement. This Campaign Statement contained false, deceptive and misleading entries and information including, but not limited to, false reporting of the date when Hergert or his campaign incurred an expenditure of a reported $13,272.66 to the Jackson-Alvarez Group, McLean, Virginia. Hergert reported to the Commission, and citizens of the State, that this expenditure was incurred December 14, 2004; however, the expenditure actually commenced to be incurred no later than October 5, 2004, when Hergert's political consultants confirmed prior requests for public records from the University of Nebraska by giving University officials a Federal Express number to be used to transport the requested information.
3. Hergert's January 11, 2005 Campaign Statement contained material information Hergert knew to be false. Hergert knowingly furnished this materially false information to the Commission with the intent to impede the investigation of an actual criminal matter contrary to Neb Rev Stat § 28-907.
4. Hergert's actions were related, but inimical, to his duties in office, subversive of fundamental and essential principles of government, and were highly prejudicial to the public interest.
Paragraph 3 of article V provides:
3. Hergert's January 11, 2005, Campaign Statement constituted intentional obstruction, impairment or perversion of the administration of law or other governmental functions by unlawful acts, including submission of material information to the Commission which Hergert knew to be false. Hergert furnished materially false information to Commission officials with the intent to impede a criminal investigation. Hergert's conduct violated Neb Rev Stat § 28-901.
As noted, the Legislature's burden of proof in an impeachment proceeding is clear and convincing evidence. Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *393 Hamit v. Hamit, 271 Neb. 659, 715 N.W.2d 512 (2006).
There are two kinds of evidence, direct and circumstantial. See Brown v. Farmers Mut. Ins. Co., 237 Neb. 855, 468 N.W.2d 105 (1991). Circumstantial evidence is evidence of one fact, or of a set of facts, from which the existence of the fact to be determined may reasonably be inferred. Carpenter v. Cullan, 254 Neb. 925, 581 N.W.2d 72 (1998). Direct evidence is that evidence which proves the fact in dispute directly without inference or presumption. See, Father Flanagan's Boys' Home v. Agnew, 256 Neb. 394, 590 N.W.2d 688 (1999); Bland v. Fox, 172 Neb. 662, 111 N.W.2d 537 (1961).
Circumstantial evidence is not inherently less probative than direct evidence. State v. Leibhart, 266 Neb. 133, 662 N.W.2d 618 (2003). A finder of fact may rely upon circumstantial evidence and the inferences that may be drawn therefrom. See, Leibhart, supra; State v. Miner, 265 Neb. 778, 659 N.W.2d 331 (2003). A fact proved by circumstantial evidence is nonetheless a proven fact. State v. Pierce, 248 Neb. 536, 537 N.W.2d 323 (1995), citing Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).
The intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. State v. Aldaco, 271 Neb. 160, 710 N.W.2d 101 (2006).

(a) Hergert's Duplicity Before January 6, 2005
The Legislature has built its case on a paper trail of strong circumstantial evidence. The evidence clearly and convincingly establishes that in both the primary and general elections, Hergert intentionally delayed filing his forty-percent affidavits in an effort to ensure that his opponents did not receive, or did not timely receive, public funding. His conduct and inconsistent excuses undercut his credibility.
Hergert's second campaign statement in the primary election period demonstrates that by failing to file the forty-percent affidavit, a nonabiding candidate can manipulate the reporting requirements for campaign statements to keep an abiding candidate from timely receiving public funds. A nonabiding candidate can accomplish this by delaying his or her expenditures and contributions until just after the closing date of the preceding reporting period.
This is what happened in the primary election. As noted, once Hergert expended 40 percent of his estimated expenditures, Blank was entitled to $40,000 in public funds for the primary election  the difference between the $25,000 spending limit and Hergert's $65,000 estimate. But because Hergert failed to file a forty-percent affidavit until after the primary election, the NADC had no notice that Hergert had exceeded 40 percent of his maximum estimated expenditures until the filing deadline for the second campaign statement. Because the NADC's notice of Hergert's expenditures was delayed, public funds were not disbursed to Blank until 5 to 6 days before the primary election.
Hergert's conduct in the general election period was more egregious. Based on Hergert's amended estimate of $40,000 in expenditures, Blank should have been eligible for $15,000 in public campaign funds  the difference between the voluntary spending limit and Hergert's estimate. But because of Hergert's conduct in the general election, Blank did not receive any public funding.
*394 In the general election, Hergert not only failed to file his forty-percent affidavit until 10 days after the general election, he also omitted key expenditures on his second campaign statement that would have alerted the NADC that he had exceeded 40 percent of his maximum estimated expenditures by the closing date of the second reporting period. By omitting from his October 25, 2004, campaign statement expenditures to Majority Strategies and Scott Cottington, Inc.  services for which he had received invoices and was unquestionably obligated to pay  Hergert intentionally concealed these facts.
Similarly, had Hergert timely reported the $44,000 loan his committee received on October 22, 2004, the NADC would have been alerted to the probable existence of corresponding campaign expenditures. Hergert's omission of material expenditures on his October 25 campaign statement served to keep Blank from obtaining public funding for the general election. Hergert's delinquent reporting of the late $44,000 contribution ensured that the NADC would not question his omission of material expenditures in his October 25 campaign statement.
Hergert's explanations for these omissions are not credible, given his pattern of conduct and inconsistencies. For example, Hergert claimed in his State Patrol interview that his office staff was solely responsible for the accuracy of his campaign filings and, specifically, for the October 26, 2004, date used as the date his committee received the $44,000 loan. In his deposition, he initially testified that he did not know the source for the October 26 date. However, when specifically asked whether he would contradict Herrell's testimony that Hergert gave her the October 26 date to use for the late contribution report and forty-percent affidavit, he admitted that he had provided the date. While Hergert claimed that he and Herrell "tore up the office" searching for his lost forty-percent affidavit, Herrell testified that Hergert had never spoken to her about a lost affidavit other than to dictate the letter he sent to the NADC in November 2004. Hergert claimed in his State Patrol interview that he and Herrell determined the date of an expenditure  for the purpose of triggering the filing of his forty-percent affidavit-was the date a check cleared the bank. Yet, Hergert admitted that he did not look to see if a check had cleared the bank, and Herrell testified that she had never been told to look for such evidence.

(b) January 11, 2005, Campaign Statement
We now turn to the Legislature's allegation in article III that Hergert knowingly furnished false information to the NADC on January 11, 2005, and the allegation in article V that this false information was intended to impede the NADC's investigation. In Hergert's January 11 campaign statement, he reported that he had incurred an expenditure to Jackson-Alvarez on December 14, 2004. We find that Hergert knew this expenditure was incurred no later than October 12, 2004.
First, Hergert admitted in his deposition and at trial that Jackson-Alvarez had completed its work by mid-October 2004, in time for him to use its contents in his advertising. Hergert specifically admitted in his deposition that Jackson-Alvarez had completed its work before he was invoiced by Majority Strategies on October 13, and Scott Cottington, Inc., on October 17, and before the Nebraska Press Association quoted him a price on October 19. Thus, Hergert had not only incurred the Jackson-Alvarez expenditure by October 13, he was receiving the benefit of the expenditure.
*395 Second, the preprinted instructions on the unpaid bills section of Hergert's campaign statement provide, in relevant part:
List all unpaid bills, accounts payable and other payments owed by the committee, i.e., accrued expenses for goods, materials, services, or facilities received, for which payment has not been made as of the closing date of this statement. Include any amounts owed to the candidate if the candidate intends to seek reimbursement from the committee. If the exact amount of an unpaid bill is unknown, report a reasonable estimate of the amount owed.

(Emphasis supplied.) Notably, in Hergert's first campaign statement, filed on April 21, 2004, Hergert listed an unpaid bill of $9,740 as accrued on April 6. In addition, the unpaid bills section includes a bolded and capitalized "Important" notice, which provides in relevant part: "Candidates for these offices who have not agreed to abide by these limits are reminded that for the purpose of determining if a candidate has exceeded the estimate of maximum expenditures on file with the Commission, unpaid bills and accrued expenses are considered expenditures."
These instructions are explicit, and Hergert had demonstrated an understanding of them as early as April 2004. If, on his October 25 campaign statement, Hergert had properly estimated his expenditure to Jackson-Alvarez at even $7,000, and properly listed his unpaid invoices, the NADC would have been alerted that he had exceeded the 40-percent mark, or $16,000, no later than October 13, the date he received an invoice from Majority Strategies for $10,456.55. Hergert's failure to review the NADC brochures does not excuse his disregard of instructions on the forms. While Hergert defended his many filing "errors" with the excuse that the NPADA and CFLA requirements were confusing or inconsistent, his deposition testimony shows that he could not have accurately made such an assessment because he failed to inform himself of the requirements in any event. We find that Hergert's omission of the Jackson-Alvarez expenditure from his October 2004 campaign statement was deliberate.
In his January 11, 2005, campaign statement, however, Hergert falsely reported that he incurred the Jackson-Alvarez expenditure on December 14, 2004, thus deflecting the NADC's investigation away from this expenditure. When the NADC initiated an audit of Hergert's failure to file a forty-percent affidavit in case No. 04-36, it had no notice that Hergert had incurred an expenditure to Jackson-Alvarez during October 2004. Its initial investigation into the forty-percent affidavit was focused on the information shown by the committee's banking records. Nothing in the records Hergert provided would have alerted the NADC to the Jackson-Alvarez expenditure, and as noted, check No. 1065 was not written until sometime in 2005.
When Hergert sent his forty-percent affidavit to the NADC, which was received on November 12, 2004, he reported that he had mailed the affidavit on October 29. On November 12, the NADC notified Hergert that it was initiating an investigation for a possible violation of § 32-1604(5)(b). On November 22, through his attorney, Hergert repeated his "good faith" belief that he had mailed his affidavit to the NADC. On December 9, Howland notified Brashear that he intended to explore "the facts and circumstances surrounding [Hergert's] belief" in a deposition pursuant to the investigation in case No. 04-36. Thus, Hergert was on notice that his intent concerning the forty-percent affidavit was at issue in the NADC's investigation. Moreover, concealment of expenditures in *396 general, and the Jackson-Alvarez expenditure in particular, was relevant to possible criminal charges.
The language in § 32-1604(5)(b) provides, in relevant part, that "[a] candidate who intentionally fails to file the required [forty-percent] affidavit within either five-day period [for the primary or the general election period] shall be guilty of a Class II misdemeanor." (Emphasis supplied.) Furthermore, during the investigation of case No. 04-36 and up until the settlement agreements were reached, a conclusion that Hergert had violated the felony provisions of § 32-1607(4) was also possible. Subsection 32-1607(4) provides: "Any candidate who files, or causes to be filed, [a forty-percent] affidavit executed by him or her that he or she knows contains any material element which is false shall be guilty of a Class IV felony." (Emphasis supplied.)
Thus, Hergert's intentional conduct of filing his forty-percent affidavit late  received on November 12, 2004  and swearing that he had spent 40 percent of his estimated expenditures on October 26, could have subjected him to criminal charges. Given the NADC's record request, Hergert was cornered. He could not conceal the expenditures that he had paid to Scott Cottington, Inc. ($36,000 on October 19), or to Majority Strategies ($10,456.55 on October 19), because those expenditures were shown on his October bank statement. Hergert did not pay Jackson-Alvarez, however, until sometime in March or April 2005 and did not report this unpaid expenditure until January 11. Thus, the date of the expenditure to Jackson-Alvarez represented the only information that Hergert could conceal in an effort to deflect a finding that he had intentionally and knowingly filed a false report as to when he exceeded 40 percent of his estimated maximum expenditures.
On January 10, 2005, after he took office, we find that Hergert directed Herrell to fax two substitute pages to Jacobson to replace in his postelection campaign statement before Jacobson sent the statement to the NADC. The second substituted page was the unpaid bills section, in which Hergert reported that the Jackson-Alvarez expenditure was for "Research/Communications" and incurred on December 14, 2004. We find that the filing was a false representation to the NADC on January 11, 2005, asserting, in effect, that the Jackson-Alvarez expenditure was not relevant to its investigation of the expenditures he made in October 2004 and the actual triggering date for his late forty-percent affidavit filed in November.
Howland's letter to Brashear on March 8, 2005, during ongoing settlement negotiations, indicates that as of that date, Howland's concern about the Jackson-Alvarez expenditure was limited to ensuring that Hergert did not attempt to pay the unpaid bill through an additional loan. It was only after the NADC had approved the settlement agreements with Hergert in April 2005 that the State Patrol initiated an independent investigation, in July 2005, and confronted Hergert about the Jackson-Alvarez expenditure.
Hergert contends that the uncontested evidence shows that he did not know of the actual amount of the Jackson-Alvarez bill until December 2004. However, we are not bound to blindly accept as true all testimony which is not directly contradicted or impeached. The testimony of a witness should be weighed in connection with all the facts in the case. Pahl v. Sprague, 152 Neb. 681, 42 N.W.2d 367 (1950).
We find Hergert's explanations for reporting the Jackson-Alvarez expenditure as having been incurred on December 14, *397 2004, are not credible and contradicted by his own testimony. In his deposition, Hergert initially testified that neither he nor anyone in his campaign had communicated with Jackson-Alvarez in any way since October. However, his only explanation for using the December 14 date was his claim that some unknown person from Jackson-Alvarez had contacted some unknown person in his campaign about money his committee owed the firm. Although Hergert purportedly delayed payment to Jackson-Alvarez because he disputed the amount of its "claim," he nonetheless used the December 14 purported contact date as the date the expenditure was incurred because he knew Jackson-Alvarez' work had been completed in October.
Hergert denied knowing who directed that corrections be made to the January 11, 2005, campaign statement or who directed that the corrections be faxed to Jacobson with instructions to use the substitute pages. Herrell, however, testified that she faxed the substituted pages to Jacobson at Hergert's direction and that Hergert provided the information stated on the unpaid bills section of the January 11 campaign statement. Considering the inconsistencies in Hergert's testimony, we believe Herrell; we do not believe Hergert.
We find that the Legislature has proved by clear and convincing evidence as alleged in article III that while in office Hergert knowingly furnished materially false information to the NADC on January 11, 2005, when he represented that he had incurred an expense to Jackson-Alvarez on December 14, 2004. See § 28-907. We also note that such conduct is a potential Class IV felony under § 49-4,134 ("any person who files a statement or report required under the [NPADA] knowing that information contained in the statement or report is false ... shall be guilty of a Class IV felony"). We further find that the false statement was intended to deflect the NADC's investigation into the forty-percent affidavit issue in case No. 04-36 away from this incurred expenditure. Thus, Hergert, as alleged in article V, intended to impede the investigation of an actual criminal matter. We therefore conclude that Hergert is guilty of article III, "False Reporting," and article V, "Obstructing Government Operations."

5. HERGERT'S ARGUMENTS
Hergert makes certain legal arguments at odds with our conclusions, and to the extent his arguments are directed toward articles III and V, we address them.

(a) Article III
Hergert contends that the NADC was not conducting a criminal investigation at the time he filed his January 11, 2005, campaign statement and that § 28-907(1)(a) cited in article III is intended only to prevent police officers from wasting time by pursuing false leads. Section § 28-907(1)(a) prohibits a person from "[f]urnish[ing] material information he or she knows to be false to any peace officer or other official with the intent ... to impede the investigation of an actual criminal matter."
Although it is not necessary for an actual crime to have been committed, in the context of an ongoing investigation, false reporting is dependent upon "the existence of a legitimate and valid investigation of facts which could constitute a predicate offense." State v. Ewing, 221 Neb. 462, 468, 378 N.W.2d 158, 162 (1985). This court has stated that the purpose of § 28-907(1)(a) is "to prevent the public from willfully furnishing erroneous information to law enforcement officers and thus interfering with the performance of their duties." Ewing, 221 *398 Neb. at 468, 378 N.W.2d at 162. Interference with an officer's duties includes false statements that impede an officer's gathering of information. State v. Nissen, 224 Neb. 60, 395 N.W.2d 560 (1986). Also, subsection (a) includes "other official[s]" besides police officers. Thus, the statute is intended to prevent persons from providing false information to police officers and other officials who have the authority to investigate actual criminal matters. Here, at the time that Hergert filed his false January 11, 2005, campaign statement, the NADC's investigation was ongoing, and the investigation could have resulted in criminal prosecution. See §§ 49-14,123(11), 49-14,133 and 49-14,134. We reject Hergert's argument.

(b) Article V
Relying on the three-justice plurality in State v. Douglas, 217 Neb. 199, 349 N.W.2d 870 (1984), Hergert argues that the Legislature has failed to prove Hergert committed an obstruction of a government operation as alleged in article V by filing his January 11, 2005, campaign statement, because Hergert did not engage in a physical act with intent to impede government operations. Hergert's reading of our case law under § 28-901 dealing with this offense is incorrect. Section 28-901(1) provides:
A person commits the offense of obstructing government operations if he intentionally obstructs, impairs, or perverts the administration of law or other governmental functions by force, violence, physical interference or obstacle, breach of official duty, or any other unlawful act, except that this section does not apply to flight by a person charged with crime, refusal to submit to arrest, failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.
(Emphasis supplied.)
In Douglas, the three-justice plurality stated that the failure to volunteer information could not offend § 28-901, even if the investigation was thereby deflected, "for the offense [of obstruction of government operations] must consist of physical interference or some unlawful act." 217 Neb. at 216, 349 N.W.2d at 881. In contrast, the dissent in Douglas on this article of impeachment rejected the contention that the offense requires an obstruction be committed "`by force, violence, physical interference or obstacle.'" Id. at 281, 349 N.W.2d at 911 (Shanahan and Grant, JJ., and Moran, District Judge, dissenting).
Hergert contends that this court adopted the plurality's definition of an obstruction in State v. Fahlk, 246 Neb. 834, 524 N.W.2d 39 (1994) (concluding that evidence of obstruction of government operations was insufficient). However, in Fahlk, we clarified that obstruction of government operations can be shown in one of three ways: by showing that the defendant "(1) committed some physical act, (2) breached an official duty, or (3) committed some other unlawful act with the intent to obstruct the administration of justice." 246 Neb. at 853, 524 N.W.2d at 53. We further stated that Douglas established that neither the failure to volunteer information nor words intended to frustrate law enforcement are a physical act that violates § 28-901. But we limited the plurality's statements in Douglas to the first prong of the three-part inquiry and went on to analyze the remaining prongs.
To prove obstruction under the second prong, we concluded that the official's misconduct must be a "`purposeful obstruction of governmental function by breach of official duty.'" Fahlk, 246 Neb. at 854, *399 524 N.W.2d at 53. For the third prong, obstruction by unlawful act can be "`any affirmative violation of legal duty, whether imposed by criminal statute, tort law, or administrative regulation.'" Id. Here, the second prong  breach of an official duty  is the most applicable. We conclude that the Legislature has shown, as alleged in article V, that an "elected [officer] of this state breached his official duty to be truthful during an official investigation and that he thus obstructed government operations." See Douglas, 217 Neb. at 281, 349 N.W.2d at 911 (Shanahan and Grant, JJ., and Moran, District Judge, dissenting). We reject Hergert's argument.

(c) Duties in Office
Hergert argues that the filing of the various campaign forms is unrelated to the specific duties of the office of regent. Hergert misapprehends a public officer's duties, which extend beyond the officer's job description. An officer's public duties include the duty to cooperate with investigations. In State v. Douglas, 217 Neb. 199, 349 N.W.2d 870 (1984), this court, sitting as a court of impeachment, was confronted with accusations similar to those before us. The Attorney General was accused of misrepresenting facts and lying during a sworn interview that was conducted pursuant to an official investigation into his conduct.
Because five members of this court must concur in finding an impeachable misdemeanor, the Attorney General was not convicted. Id. However, every member of the court in Douglas determined that a state officer has a fiduciary duty to the public to provide truthful information during an official investigation of the officer. According to the four justices, under such circumstances, an officer violates his fiduciary duties by withholding material information, as well as by lying about material information. Regarding the Attorney General's failure to disclose material information, the dissent in Douglas stated:
Throughout the United States, public officers have been characterized as fiduciaries and trustees charged with honesty and fidelity in administration of their office and execution of their duties....
... When a relationship of trust and confidence exists, the fiduciary has the duty to disclose to the beneficiary of that trust all material facts, and failure to do so constitutes fraud.
(Citations omitted.) 217 Neb. at 256, 349 N.W.2d at 900 (Hastings, Shanahan, and Grant, JJ., and Moran, District Judge, dissenting).
A similar reasoning was relied upon by the dissent to conclude that the Legislature had proved an impeachable misdemeanor based on circumstantial evidence that the Attorney General had lied to an investigator when he claimed not to know of a fact material to the investigation:
If [the Attorney General] did lie as charged, he did so while in office. If, under State v. Hastings, 37 Neb. 96, 55 N.W. 774 (1893), gross negligence in office done corruptly is an impeachable offense, a lie is certainly a corrupt act and is more than negligence.
As noted in the dissenting opinion on [the article of impeachment charging misrepresentation], we determine that defendant's conduct in so lying is a clear breach of his fiduciary duty to the people of the State of Nebraska requiring him, as Attorney General, to be honest in his official actions.
217 Neb. at 280, 349 N.W.2d at 911 (Shanahan and Grant, JJ., and Moran, District Judge, dissenting).
The three-justice plurality did not believe the Legislature had proved its allegations of misrepresentation but agreed that *400 an officer has a duty to cooperate in official investigations:
If [the Attorney General] "did knowingly misrepresent his knowledge of [a material fact,]" he did so in the execution of his duties, as he was bound to assist in the investigation; and, accordingly, if the offense be deemed sufficiently serious, he could be removed upon the trial of an impeachment for a "misdemeanor in office" as that constitutional term is judicially construed.
(Emphasis supplied.) State v. Douglas, 217 Neb. 199, 210, 349 N.W.2d 870, 878-79 (1984). Relying on an opinion by the New Jersey Supreme Court, the plurality in Douglas defined an officer's duties as follows:
"[Public officers] stand in a fiduciary relationship to the people whom they have been elected or appointed to serve.... As fiduciaries and trustees of the public weal they are under an inescapable obligation to serve the public with the highest fidelity. In discharging the duties of their office they are required to display such intelligence and skill as they are capable of, to be diligent and conscientious, to exercise their discretion not arbitrarily but reasonably, and above all to display good faith, honesty and integrity. ... They must be impervious to corrupting influences and they must transact their business frankly and openly in the light of public scrutiny so that the public may know and be able to judge them and their work fairly...."
"These obligations are not mere theoretical concepts or idealistic abstractions of no practical force and effect; they are obligations imposed by the common law on public officers and assumed by them as a matter of law upon their entering public office."
(Emphasis supplied.) Douglas, 217 Neb. at 225-26, 349 N.W.2d at 885-86, quoting Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 86 A.2d 201 (1952). We agree with these statements describing an officer's duties and reject Hergert's contention that he could be impeached only for conduct involving functions specific to his office as regent.

(d) Technical Violations
Relying on the three-justice plurality in Douglas, supra, Hergert contends that his violations were technical violations of law because many candidates make similar mistakes and the regulations are confusing. It is not clear that this argument is directed toward the January 11, 2005, filing, and to the extent that it is, we conclude it is without merit.
In State v. Hastings, 37 Neb. 96, 128, 55 N.W. 774, 785 (1893), this court stated:
It is better that the state should be confined to the remedy afforded by the Criminal Code and civil action on the bonds of its officers, than an alternative so dangerous and so liable to abuse as impeachment for technical violations of law, errors of judgment, mistake of fact, or even neglect of duty such as disclosed by the proofs in this case.
We agree with this statement and recognize the danger of finding an impeachable misdemeanor for a technical violation of the law. However, the evidence of Hergert's intent regarding the January 11, 2005, filing does not show simple neglect or an error of fact or judgment. Rather, the facts show that Hergert was "willfully blind" to the actual date the Jackson-Alvarez expense was incurred and that Hergert deliberately acted to misrepresent that date. See Douglas, 217 Neb. at 280, 349 N.W.2d at 911 (Shanahan and Grant, JJ., and Moran, District Judge, dissenting).

*401 6. DEFENDANT'S FIRST AMENDMENT CHALLENGES
In his answer and closing trial brief. Hergert challenges articles of impeachment VII, IX, and X on First Amendment grounds, arguing that various provisions of the NPADA and the CFLA are unconstitutional limitations on campaign expenditures. Relying on Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), Hergert asserts that the forty-percent affidavit requirement of § 32-1604(5)(b), as well as the 50 percent of contributions loan limitation of § 49-1446.04, are unconstitutional constraints on campaign financing and violative of the First Amendment. Further, Hergert attacks the constitutionality of the CFLA generally on First Amendment grounds, arguing, inter alia, that requiring nonabiding candidates to lock themselves into expenditure estimates unconstitutionally bars a candidate from spending as much money as he or she feels necessary to combat his opponent late in the race if newly discovered campaign issues arise. That, Hergert asserts, amounts to an overwhelming burden on a nonabiding candidate's right to speak.
Hergert's constitutional challenge is not unlike the situation in State ex rel. NSBA v. Douglas, 227 Neb. 1, 416 N.W.2d 515 (1987) (NSBA v. Douglas), in which the respondent, Paul L. Douglas, challenged the constitutionality of the NPADA in an attorney disciplinary proceeding. In NSBA v. Douglas, this court adopted the "`fraud and deceit' standing doctrine" established in Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). See State v. Monastero, 228 Neb. 818, 830, 424 N.W.2d 837, 846 (1988). That doctrine "precludes a defendant's constitutional challenge to a particular statute, or statutory scheme, when the defendant has fraudulently circumvented or avoided that particular statute and ... seeks to raise a constitutional question concerning the statute which the defendant had fraudulently circumvented or avoided" in a proceeding not intended to enforce the statute. Id. at 830-31, 424 N.W.2d at 846.
The Dennis Court stated in part: "`When one undertakes to cheat the Government or to mislead its officers, or those acting under its authority, by false statements, he has no standing to assert that the operations of the Government in which the effort to cheat or mislead is made are without constitutional sanction.'" 384 U.S. at 866, 86 S.Ct. 1840, quoting Kay v. United States, 303 U.S. 1, 58 S.Ct. 468, 82 L.Ed. 607 (1938). Relying on that language in Dennis, we held that the respondent lacked standing to raise a constitutional challenge to the NPADA. We stated:
In Dennis, the prosecution was for the petitioners' fraud. It was not an action to enforce the statute claimed to be unconstitutional. The same is true with the case at bar. It is a case directed at the respondent's actions, not a case to enforce the statute claimed to be unconstitutional.
NSBA v. Douglas, 227 Neb. at 36, 416 N.W.2d at 536.
Those same principles apply in this matter, albeit an impeachment proceeding rather than an attorney disciplinary or criminal proceeding. As in NSBA v. Douglas, the question in this impeachment proceeding is not whether Hergert is technically guilty of the "crimes charged" in the articles of impeachment which arise out of the CFLA and/or the NPADA; rather, as we noted earlier in this opinion, it is Hergert's conduct or actions which are at issue. The holding in NSBA v. Douglas is equally applicable here:
In the proceeding before us, relator is not trying in any way to charge respondent with any violation of the act, but *402 has merely alleged that certain conduct of respondent has not measured up to the standard that our statutes have set for certain purposes. Respondent, of course, is in a particular situation where he, as the Attorney General of Nebraska, chose to comply with the act by making filings under the act. We hold that respondent has no standing to challenge the act's constitutionality in this proceeding and that we are judging his conduct in furnishing information to the public, as required by the act. If respondent has chosen to mislead the public by his filings under the act, we are not concerned with any violation of the act, but with his conduct in improperly informing, or in misleading, the public.

(Emphasis supplied.) (Emphasis in original.) 227 Neb. at 36, 416 N.W.2d at 536. In this case, Hergert chose to comply with the CFLA and the NPADA by making filings thereunder. We are not concerned with specific violations of these acts in this impeachment proceeding, but, rather, we are concerned only with his conduct in furnishing the NADC, as well as the public, with information required by these acts. Thus, in this case, as in NSBA v. Douglas, we will not reach the claims of the unconstitutionality of these statutes.

VI. CONCLUSION
For the reasons fully explained above, we find Hergert guilty of the charges set forth in articles of impeachment III and V. We find that in the primary and general elections, Hergert intentionally manipulated and violated Nebraska's campaign finance laws in a scheme to prevent his opponents from receiving public campaign funds. During the campaign and, significantly, after he took office, Hergert intentionally filed false reports of campaign spending in an attempt to cover up his conduct. Hergert's various explanations for his actions contradict one another and are not believable when the clear and convincing evidence before this court is considered.
Thus, we conclude that the Legislature has proved by clear and convincing evidence that, as alleged in article III, "False Reporting," after he was in office, Hergert knowingly furnished materially false information to the NADC on January 11, 2005, when he represented that he had incurred an expenditure to Jackson-Alvarez on December 14, 2004, rather than in early October 2004. We further conclude that as alleged in article V, "Obstruction of Government Operations," the false statement filed January 11, 2005, was intended to deflect the NADC's investigation away from the Jackson-Alvarez accrued expense and, thus, to impede the investigation of an actual criminal matter. The actual matter under investigation was the NADC's case No. 04-36, which focused on Hergert's violation concerning the forty-percent affidavit, and such violation could have subjected him to criminal charges. That affidavit was required to be filed for the general election for regent for the seventh district when Hergert reached 40 percent of his estimated maximum expenditures for this election. As a result of Hergert's violations, public funds were not disbursed to Hergert's opponent, who was entitled to receive such funds during the campaign. The triggering date for release of public funds was under investigation in case No. 04-36, and Hergert's January 11, 2005, filing covered up the true triggering date and diverted the investigation. Hergert's conduct on January 11 clearly violated Hergert's duties as a public officer to provide truthful information during the course of an investigation into his conduct.
We conclude that Hergert is guilty as charged in articles III and V. In view of our finding of guilt as to articles III and V, *403 Hergert's motion to dismiss is overruled as to articles III and V, and, as to articles I, II, IV, and VI through X, the motion to dismiss is overruled as moot. Based on our finding of guilt, it is the judgment of this court that C. David Hergert is removed from office and is disqualified from holding and enjoying any office of honor, profit, or trust in this State.
JUDGMENT OF GUILTY ON ARTICLES III AND V, AND ORDER OF REMOVAL AND DISQUALIFICATION FROM OFFICE.
STEPHAN, J., not participating.